AMY E. JACKS (#155681)
LAW OFFICE OF AMY E. JACKS
315 E. 8th St. #801
Los Angeles, CA  90014
Telephone: (213) 489-9025
Facsimile: (213) 489-9027
Email: amyejacks@sbcglobal.net

SHAUN KHOJAYAN (#197690)
LAW OFFICES OF SHAUN KHOJAYAN
 & ASSOCIATES, P.L.C.
515 S. Flower Street, 19th Floor
Los Angeles, CA 90071
Telephone: (310) 274-6111
Facsimile:  (310) 274-6211
Email: shaun@khojayan.com

Attorney for Defendant Paul Gary Wallace (#1)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**(HONORABLE ANDRE BIROTTE JR.)**

| UNITED STATES OF AMERICA, | Case No.:  20-cr-00293-AB-1 |
|---|---|
| Plaintiff, | |
| v. | MOTION FOR ACCESS TO GRAND JURY MATERIALS |
| PAUL GARY WALLACE (#1), | Date: November 20, 2020 |
| Defendant. | Time: 1:30 p.m. |

20-CR-00293-AB-1

PLEASE TAKE NOTICE that on November 20, 2020, at 1:30 p.m., or on any other date and time as the Court may order, in Courtroom 7B the above-captioned Court, United States Courthouse - 350 West First Street, Los Angeles, CA 90012 - Courtroom 7B, before the Honorable Andre Birotte, Defendant Paul Gary Wallace will and hereby does respectfully move the Court pursuant to the Fifth and Sixth Amendments of the United States Constitution, Rule 6 of the Federal Rules of Criminal Procedure,  and the Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq.* for an Order allowing Mr. Wallace access to grand jury materials. The Motion is based on the below Memorandum of Points and Authorities, the Declaration of Shaun Khojayan, the record in this case, and any other matters that the Court deems appropriate.

The defense attempted to meet and confer with the government regarding these issues on October 22, 2020 but did not receive a response.

Respectfully submitted,

Dated:  October 23, 2020

s/Shaun Khojayan
Attorney for Defendant Paul Gary Wallace
Email: shaun@khojayan.com

2.

20-CR-00293-AB-1

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

A grand jury returned an indictment against defendant Paul Gary Wallace on July 16, 2020. However, this District's and Chief Judge's orders from earlier this year in response to the Covid-19 pandemic imply that the grand jury may have met other than "in person" starting as early as April 13, 2020. These other than in-person meetings may have violated Federal Rule of Criminal Procedure 6 ("Rule 6") based on how the grand jurors participated, whether the proceedings were private, who else was present during the proceedings and what procedures were taken to prevent grand jury infirmities.

As well, Covid-19's disproportionate impact on Latino, Black and lower socio-economic communities raise additional questions as to whether grand jurors since the start of this January 2020 grand jury panel were excluded or excused in a manner that had a discriminatory effect in violation of 28 U.S.C. §§ 1861, 1862.

The defense seeks release of grand jury materials under Rule 6 and 18 U.S.C. § 1867 for a possible motion to dismiss on these bases.

## II.    GRAND JURY MEETINGS OTHER THAN IN PERSON AND AWAY FROM THE COURTHOUSE POTENTIALLY VIOLATE FED.R.CRIM.P. 6

On March 31, 2020, to combat Covid-19 based on the recommendations of national, state and local health departments, Chief Judge Phillips stated:

[I]n order to protect public health and safety, the Court issues the following order:

1. Effective immediately, all regularly scheduled grand jury proceedings in the Central District of California are suspended and continued to May 4, 2020, pending further Order of this Court; and

2. Grand jurors will not otherwise be required to report for service or to call in to the United States Attorney's Office for reporting purposes during the period for which grand jury proceedings are suspended.

3.

*See* C.D. Cal. Order of the Chief Judge No. 20-044.

Then, on April 13, 2020, Chief Judge Phillips issued General Order 20-05 which ordered, in pertinent part:

2. The Court will not call in jurors for service in civil or criminal jury trials until after June 1, 2020 or otherwise ordered by the Court. Individual Judges may issue other orders concerning future continuances as necessary and appropriate….

7. ***In-person*** meetings of the grand juries shall remain suspended as set forth in Order of the Chief Judge No. 20-044, and that period of suspension is extended through and including June 1, 2020, unless otherwise ordered by the Court.

*See* C.D. Cal. General Order No. 20-05 (emphasis added).

On May 28, 2020, Chief Judge Phillips ordered that:

8. ***In-person*** meetings of the grand juries may resume ***at the discretion*** of the Chief Judge.

*See* C.D. Cal. Amended General Order No. 20-08 (emphases added)

The Chief Judge provided no further details about these meetings, when or how they resumed, how they differed from prior proceedings and under what circumstances the Chief Judge exercised that discretion.  It is unknown when the grand jury indicted Mr. Wallace or if it was sealed for some time before the indicted was returned and filed on July 16, 2020.

For the first time, the Chief Judge's orders put forward the concept of an "in-person" grand jury meeting – as opposed to prior orders that used "grand jury proceedings." The difference in language raises concerns about the grand jurors meetings other than in person, through the telephone or by video conference in possible violation of Rule 6. If the grand jury met by video or telephone, Rule 6 (d) specifically limits who may be present when the grand jury is in session and Rule 6(f) only recognizes the use of video as a means for the magistrate to take the return

4.

of an indictment. Further, Rule 6(e)(2) emphasizes the secrecy of the matters before the grand jury.

Given that jury trials have been suspended and no petit jury summons have issued since April 13, 2020 to avoid spreading Covid-19,[1] there is good cause for the release of grand jury materials to the defense to investigate the manner in which "in person" and other than "in person" grand jury meetings were conducted since April 13, 2020.

## III. COVID-19 HAS IMPACTED LATINO, BLACK AND LOWER SOCIO-ECONOMIC COMMUNITIES IN THIS DISTRICT MUCH MORE NEGATIVELY THAN ITS WHITE POPULATION RAISING CONCERNS AS TO WHETHER PROTECTED CLASS GRAND JURORS WERE EXCLUDED IN VIOLATION OF THE FIFTH AMENDMENT AND 28 U.S.C. §§ 1861, 1862.

"[A]ll litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that *all citizens shall have the opportunity to be considered for service on grand and petit juries* in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose." 28 U.S.C. § 1861 (emphasis added).

---

1 On August 6, 2020, the Chief Judge found, among other things, that:

The COVID-19 rates of infection, hospitalizations and deaths have significantly increased in the Central District of California in the last thirty days such that holding jury trials substantially increases the chances of transmitting the Coronavirus. The Court concludes that conducting jury trials would also likely place prospective jurors, defendant, attorneys, and court personnel at unnecessary risk. Therefore, the Court finds that suspending criminal jury trials in the Central District of California because of the increase in reported COVID-19 infections, hospitalizations, and deaths serves the ends of justice and outweigh the interests of the public and the defendants in a speedy trial.

*See* C.D. Cal. General Order No. 20-09.

"No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States or in the Court of International Trade on account of race, color, religion, sex, national origin, or economic status." 28 U.S.C. § 1862.

Mr. Wallace seeks access to these records in connection with his preparation of an anticipated motion challenging the selection methods under the Jury Selection and Service Act. *See* 28 U.S.C. § 1867(a). Under the Act, a defendant may move to dismiss an indictment or stay the proceedings on the grounds of substantial failure to comply with the provisions of the Act in selecting a grand jury. *Id.*

Section 1867(f) allows a defendant to "inspect, reproduce, and copy such records or papers at all reasonable times during the preparation and pendency of" a motion to dismiss under Section 1867(a). The Supreme Court has stated that "without inspection, a party almost invariably would be unable to determine whether he has a potentially meritorious jury challenge." *Test v. United States*, 420 U.S. 28, 30 (1975). This "unqualified right to inspection is required not only by the plain text of the statute, but also by the statute's overall purpose of insuring 'grand and petit juries selected at random from a fair cross section of the community.'" *Test*, 420 U.S. at 30 (quoting 28 U.S.C. § 1861).

"To avail [himself] of this right of access to otherwise nonpublic jury selection records, a litigant need only allege that [he] is preparing a motion challenging the jury selection procedures." *United States v. Layton*, 519 F. Supp. 946, 958 (N.D. Cal. 1981). If inspection reveals grounds upon which to challenge the jury selection, a defendant may file a motion to dismiss the indictment under Section 1867(a). *United States v. Beaty*, 465 F.2d 1376, 1381 (9th Cir. 1972). The court shall then grant the motion if it determines that the jury selection procedure violated the Act. *Id*. at 1382.

Here, the defense has serious concerns as to whether protected class grand jury members were denied the opportunity to serve on the grand jury or excluded from grand jury service as a result of the resumption of grand jury proceedings

6.

given the disproportionate negative impact of Covid-19 on the Latino, Black and lower socio-economic communities in this district as compared to its White population. *See also* National Jury Project Litigation Consulting/West Survey Findings June 2020: COVID-19 and Jury Service, available at http://www.njp.com/covid-19-and-jury-service/ (June 12-18, 2020 survey of more than 400 jury-eligible residents in Los Angeles and the six Bay Area counties finding difficulties in "select[ing] juries throughout 2020 which are diverse and represent a cross section of the public without imposing undue hardship"); Millet GA, Jones AT, Benkeser D, et al. *Assessing Differential Impacts of COVID-19 on Black Communities*, Annals of Epidemiology 47:37-44 (July 2020) https://www.sciencedirect.com/science/article/pii/S1047279720301769?via%3Dihub (Using publicly available data in April 2020, finding black communities account for 52% of COVID-19 diagnoses and 58% of COVID-19 deaths nationally and that social conditions, structural racism, and other factors elevate risk for COVID-19 diagnoses and deaths in black communities.)

It is irrelevant if the jury selection plan or procedures was prepared and implemented in good faith, or that discrimination, if any, was unintentional, nor is the defendant required to show prejudice; the only question is whether 28 U.S.C. § 1861 et seq., has been complied with. *United States v. McDaniels*, 370 F. Supp. 298 (E.D. La. 1973), aff'd, 509 F.2d 825 (5th Cir. 1975).

A defendant has standing to challenge the exclusion of cognizable groups from the grand or petit jury under the Fifth Amendment even though that defendant is not a member of the excluded group. *Peters v. Kiff*, 407 U.S. 493, 497-500 (1972) (plurality opinion).

Covid-19's disproportionate impact on the Latino, Black and lower socio-economic communities in this district raises several questions about the resumption of grand jury proceedings resulting in possible violations of the Jury Selection and Services Act, 28 U.S.C. § 1861 *et seq.*

**A.** <u>**Covid-19's Disproportionate Impact on the Latino and Black Communities of Los Angeles County**</u>

The Chief Judge looked to local public health authorities for guidance on the impact of Covid-19 on the community since at least March 19, 2020. *See* C.D. Cal. Order of the Chief Judge No. 20-042 (activating the Continuity of Operations Plan based, in part, on the recommendation of "local health departments"); C.D. Cal. Order of the Chief Judge No. 20-044 (suspending grand jury proceedings based, in part, on the recommendation of "local health departments").

The disproportionate impact of Covid-19 on the Latino and Black communities of Los Angeles County was known at least as early as April 28, 2020 when the Los Angeles County Department of Public Health, Chief Science Office, published its report on the subject on April 28, 2020, entitled *Covid19 Racial, Ethnic and Socioeconomic Data and Strategies Report*. *See* http://publichealth. lacounty.gov/docs/RacialEthnicSocioeconomicDataCOVID19.pdf (April 28, 2020) (Exhibit A).

Los Angeles County's report found:

Through April 26th, 2020, there were a total of 19,516 confirmed COVID-19 cases in LA County, excluding Long Beach and Pasadena (Table 1). Race/ethnicity data were available for 10,699 (54.8%) of these cases. Of these, 46.4% were Latino, 23.7% were white, 11.5% were Asian, 8% were African American, 1.5% were Native Hawaiian or other Pacific Islander (NHOPI), 0.1% were American Indian or Alaska Native (AI/AN), and 8.6% identified as another race/ethnicity.

*Id.* at 2. Adjusted for age per 100,000 in the population:

Native Hawaiians or other Pacific Islanders had the highest population rate of COVID-19 cases (840 per 100,000), followed by Latinos (114 per 100,000), African Americans (102 per 100,000), whites (78 per 100,000), Asians (73 per 100,000) and American Indian or Alaska Natives (50 per 100,000).

*Id.* at 3.

The percentages of COVID-19 hospitalized patients admitted to the intensive care units at hospitals were higher in Asian, Latino and Black communities compared to the White population, with 30.4% of Asians, 28.6% of African Americans, 29.7% of Latinos, and 11.1% of whites admitted. *Id.* at 8.

Latino and Black communities also have had a much higher rate of death from Covid-19 compared to the White population in Los Angeles County at rates of 13, 10 and 6 per 100,000 people, respectfully.  *Id.* at 6.

To approximate the socioeconomic status of confirmed COVID-19 cases, Los Angeles County analyzed the percent of residents below the federal poverty level ("FPL") in the census tracts where the home addresses of confirmed cases were located.

Census tract FPL data were available for 18,090 (93%) of the confirmed cases. Of these cases, 24% were from tracts with <10% of residents below FPL, 34% were from tracts with 10% to <20% below FPL, 25% were from tracts with 20% to <30% below FPL, and 18% were from tracts with 30% to 100% below FPL.

*Id.* at 4.

An analysis of this data per 100,000 in the population indicated that:

those living in the highest poverty areas had the highest population rate of confirmed cases (263 per 100,000), followed by those in the second highest poverty areas (213 per 100,000), the third highest poverty areas (170 per 100,000) and the lowest poverty areas (137 per 100,000).

*Id.*

In summary, the Los Angeles County Department of Public Health concluded that the rates of Covid-19 confirmed cases and deaths were as of April 28, 2020, (and continue to be) "higher among African Americans and Latinos than among whites and Asians" and that "[t]here is also a clear social gradient in the data

9.

on cases and deaths indicating that as relative income decreases, rates of confirmed cases and deaths increase." *Id.* at 12. "These trends are of great concern and suggest that more affluent residents have better access to COVID19 testing and treatment services, even as the rates of infection appear to be higher in lower income communities." *Id.*

**B. The District's Remaining Counties Also Report a Disproportionate Impact of Covid-19 on Latino and Black Communities**

Just as in Los Angeles County, Riverside County reported a similar disproportionate impact of Covid-19 on its Latino, Black and other minority communities compared to its White population with the rates of Covid-19 cases per 100,000 people as being: 219.35, 108.26 and 76.13, respectively. *See* https://www.rivcoph.org/Portals/0/Documents/CoronaVirus/October/Dashboard/1/ COVID_19_Race_Ethnicity_Data%2010.6.20%20for%20website.pdf?ver=2020- 10-06-162028-653&timestamp=1602026436630 (visited October 15, 2020) (Exhibit B).

In San Bernardino County, its Latino population had the largest number and percentage of Covid-19 cases at 27,244 cases or 46% of all cases. *See* https://sbcph.maps.arcgis.com/apps/opsdashboard/index.html#/44bb35c804c44c828 1da6d82ee602dff (visited October 15, 2020) (Exhibit C).

Santa Barbara County also reported a far greater number of members of its Latino population infected (5353) with Covid-19 than its White population (898). *See* https://publichealthsbc.org/status-reports/ (visited October 16, 2020) (Exhibit D).

In San Luis Obispo County, the Latino population accounts for 46% of Covid-19 cases even though the Latino community only accounts for 23% of the county's population. *See* https://www.emergencyslo.org/en/positive-case-details. aspx (visited October 15, 2020) (Exhibit E).

10.

In Ventura County, the Latino population accounts for 60% of the county's Covid-19 cases as compared to its White population which accounts for 20% of Covid-19 cases. *See* https://www.venturacountyrecovers.org/ (visited October 15, 2020) (Exhibit F).

In Orange County, the Latino population accounts for 47% of Covid-19 cases even though the Latino community only accounts for 35% of the county's population. *See* https://ochca.maps.arcgis.com/apps/opsdashboard/index.html#/cc4859c8c522496b9f21c451de2fedae (visited October 15, 2020) (Exhibit G).

Thus, given Covid-19's disproportionate impact on the Latino, Black, and lower socio-economic communities in this district as compared to the White population, protected class members of the January 2020 grand jury may likely have been impacted by Covid-19 disproportionately as compared to its white members. Protected class grand jury members may likely have been excused from service resulting in a discrimination in violation of 28 U.S.C. §§ 1861, 1862.

Therefore, the defense seeks release of grand jury materials and information to review them and determine:

1. What was the constitution of the grand jury that returned the indictment in this case? This request includes materials related to the Master Grand Jury Wheels and jury list from which the grand jurors were selected.

2. How many grand jurors in this case were excused since January 2020 and on what basis?

3. What were the racial and socio-economic details of each grand juror who was excused in this case since its impaneling in January 2020?

4. What was the excuse of each excused grand juror and how were those excuses ruled upon?

5. Was the grand jury in this case allowed to resume meeting while other grand juries remained suspended or not allowed to meet in person?

6. Why was the grand jury in this case allowed to resume meeting while other grand juries remained suspended or not allowed to meet in person?

7. The Jury Plan for the Central District of California currently in effect and, if different in any respect at the time the grand jurors indicted this case and when they returned the indictment in this case on July 16, 2020. This includes all modifications to Jury Plan due to COVID-19 Public Health Emergency.

8. Any documents that reflect changes from previous procedures from the Jury Plan for the grand jury or creation of the grand jury because of COVID-19.

9. Any order of the Court that affects the previous procedures or the Jury Plan for the grand jury or creation of the grand jury because of the COVID-19 pandemic.

10. The jury division or divisions chosen for the grand jury empanelled in this case.

11. All the AO-12 and JS-12 forms that related to the Master Jury Wheels that were used to summon the grand jurors who returned the indictment in this case, as required by 28 U.S.C. § 1863(a).

12. The juror qualification and summons forms for the persons summoned to potentially become grand jurors.

13. All COVID-19 questionnaires sent to the grand jurors and prospective grand jurors in this case.

14. The Juror Numbers for the persons selected as potential grand jurors in this case.

15. The disposition of each summoned potential grand juror as to excusal, deferment, disqualification or selection.

16. The Juror Number for each grand juror who returned the indictment in this case on July 16, 2020.

17. The attendance record and reason for absence by date of each grand juror empanelled in this January 2020 grand jury which returned the indictment in this case.

18. Did grand jury proceedings or meetings take place in this case that were not in person? How many such non in-person occurred in this case?

19. How were such non in-person meetings conducted?

20. How such non in-person meetings recorded?

21. Did the grand jury meet outside the federal courthouse? Where?

22. Did the grand jurors meet by electronic means such as through video or telephone conferencing?

23. Was ever a quorum not present during any non in-person meeting?

24. Was anyone aside from the grand jurors present during any non in-person meeting?

25. How was privacy and secrecy of the process ensured during any non in-person grand jury meeting?

26. On what criteria did the Chief Judge decide to resume in-person meetings of the grand juries in this District including the grand jury in this case?

27. On what basis did the Chief Judge order that the grand jury in this case resume meeting when jury trials were suspended in this district since April 13, 2020?

## IV.   CONCLUSION

For the foregoing reasons, the defense requests copies of the grand jury materials, transcripts and records, under an appropriate protective order, to investigate these questions and prepare a motion to dismiss the indictment based on the suspected infirmities described above.

Respectfully submitted,

Dated: October 23, 2020

s/Shaun Khojayan
Attorney for Defendant Wallace

EXHIBIT A



# COVID-19

## Racial, Ethnic & Socioeconomic
## Data & Strategies Report







# Report on LA County COVID-19 Data Disaggregated by Race/ Ethnicity and Socioeconomic Status

## April 28, 2020

# Acknowledgments

**Authorship:** Los Angeles County Department of Public Health, Chief Science Office

**Data Provided:**

- *Cases, Deaths and Persons Tested:* Los Angeles County Department of Public Health, Acute Communicable Disease Control; Medical Examiner-Coroner
- *Tests Requested:* Los Angeles Mayor's Office, Offices of Public Safety & Budget and Innovation
- *Test Referrals:* 211 Los Angeles County
- *Hospitalizations:* Los Angeles County Department of Health Services
- *COVID-19 Perceptions:* University of Southern California's *LABarometer* Project; Los Angeles County Department of Public Health, Office of Health Assessment and Epidemiology

**Strategies for Addressing COVID-19 Disparities:** Los Angeles County Health Officer

**Letters of Support:** Black Equity Initiative; Los Angeles City/County Native American Indian Commission; Asian American Native Hawaiian and Pacific Islander Health Initiative

# Report on LA County COVID-19 Data Disaggregated by Race/Ethnicity and Socioeconomic Status

## Table of Contents

Background ................................................................................................................................. 2

Organization of the Report .......................................................................................................... 2

COVID-19 Confirmed Cases by Race/Ethnicity, Age Group and Socioeconomic Status......................... 2

COVID-19 Deaths by Race/Ethnicity and Socioeconomic Status........................................................ 5

COVID-19 Testing and Testing Requests by Race/Ethnicity and Socioeconomic Status ........................ 6

DHS COVID-19 Positive Patients Hospitalized, Placed in ICU, and Average Length of Stay by Race/Ethnicity ............................................................................................................................ 8

Data Limitations and Efforts to Address these Limitations ................................................................ 10

Other Testing, Data Collection and Research Efforts Under Way or Planned by DPH and Academic Partners.................................................................................................................................... 11

Summary of Findings and Planned Response.................................................................................. 12

Attachment: Strategies for Addressing COVID-19 Disparities in Health Outcomes Across Highly Impacted Populations…………………………………………………………………………………………………13

Letter of Support: Black Equity Initiative…………………………………………………………………………21

Letter of Support: Los Angeles City/County Native American Indian Commission……………………………24

Letter of Support: Asian American Native Hawaiian and Pacific Islander Health Initiative………………26

# Report on LA County COVID-19 Data Disaggregated by Race/Ethnicity and Socioeconomic Status

## Background

Achieving racial/ethnic and socioeconomic equity in our response to the COVID-19 pandemic in Los Angeles (LA) County requires that data on all aspects of this disease be disaggregated by race/ethnicity and by measures of socioeconomic status. In recognition of this fact, the LA County Board of Supervisors (Board), on April 14th, 2020, directed the Department of Public Health (Public Health), in collaboration with the Department of Health Services (DHS) and the Department of the Medical Examiner-Coroner (MEC) to compile a report summarizing what we know to date about the racial/ethnic and socioeconomic characteristics of those who have been tested for SARS-CoV-2, the virus that causes COVID-19; those who have been diagnosed with infection; and those who have required hospitalization.

## Organization of the Report

The data provided in this report are organized according to the itemized requests in the Board motion, beginning with the four items in the revised motion from Supervisors Solis and Barger and followed by the two additional items in the amendment to that motion from Supervisor Ridley-Thomas.  After presenting the data we describe the limitations of the data and how we are addressing those limitations.

## COVID-19 Confirmed Cases by Race/Ethnicity, Age Group and Socioeconomic Status

Through April 26th, 2020, there were a total of 19,516 confirmed COVID-19 cases in LA County, excluding Long Beach and Pasadena (**Table 1**).[1] Race/ethnicity data were available for 10,699 (54.8%) of these cases. Of these, 46.4% were Latino, 23.7% were white, 11.5% were Asian, 8% were African American, 1.5% were Native Hawaiian or other Pacific Islander (NHOPI), 0.1% were American Indian or Alaska Native (AI/AN), and 8.6% identified as another race/ethnicity.[2] **Table 1** displays these data as age-adjusted rates per 100,000 in the population. Native Hawaiians or other Pacific Islanders had the highest population rate of COVID-19 cases (840 per 100,000), followed by Latinos (114 per 100,000), African Americans (102 per 100,000), whites (78 per 100,000), Asians (73 per 100,000) and American Indian or Alaska Natives (50 per 100,000). These differences in rates assume that missing data on the race/ethnicity of confirmed cases is randomly distributed across all confirmed cases, regardless of their race/ethnicity.

---

[1] Long Beach and Pasadena have independent Public Health Authorities and COVID-19 data reporting processes. Long Beach's data can be accessed at longbeach.gov and Pasadena's at cityofpasadena.net.

[2] The other race/ethnicity category includes multiple races/ethnicities and persons whose response was "other".

| Table 1: Confirmed COVID-19 Cases by Race/Ethnicity, Age-Adjusted Rates, through April 26th* (N=19,516) | | | | |
|---|---|---|---|---|
| Race/Ethnicity | N | % | Age-Adjusted Rate per 100,000 | 95% CI |
| Asian | 1,231 | 11.5% | 73.2 | (69.1-77.2) |
| African American | 882 | 8.3% | 102.3 | (95.6-109.1) |
| Latino/Hispanic | 4,960 | 46.4% | 113.6 | (110.4-116.7) |
| American Indian or Alaska Native | 12 | 0.1% | 50.3 | (21.9-78.8)^ |
| Native Hawaiian or Other Pacific Islander | 163 | 1.5% | 840.0 | (711.1-969) |
| White | 2,528 | 23.7% | 78.2 | (75.2-81.3) |
| Other | 923 | 8.6% | | |
| Unknown/Missing* | 8,817 | | | |
| *Race/ethnicity data were missing for 45.2% of cases; these data do not include Long Beach and Pasadena. ^Age-adjusted rate and confidence interval should be interpreted with caution due to a small number of cases. | | | | |

**Figure 1** presents race/ethnicity data on confirmed COVID-19 cases by age group.[1] Data on race/ethnicity by age group were available for 10,685 (54.7%) of these cases. Evidence has shown that people of all ages are susceptible to COVID-19 infection and this is borne out by the data in Figure 1.  Three fourths of all confirmed cases with available age group and race/ethnicity data were among working age adults. This has important implications as LA County moves toward reopening businesses during the recovery period, and points to the importance of continued social distancing and infection control measures during that time. People over age 65 are more likely to have severe illness if they are infected, and 24.9% of confirmed cases were among people over age 65. Compared to this countywide figure, whites (35.3%), Asians (32.2%) and African Americans (31.6%) had higher percentages of confirmed cases among those over age 65. Latinos (17.6%) had a lower percentage of confirmed cases among those over age 65 than the county overall. Also of note, Latinos had the highest percentage of confirmed cases among those under 18 years of age (1.5%). Although small, this percentage was almost twice as high as the percent of cases under age 18 among whites and African Americans and three times higher than among Asians.

3



*Race/ethnicity by age group data were missing for 45.3% of cases.

To approximate the socioeconomic status of confirmed COVID-19 cases, **Table 2** displays data by area poverty, which is the percent of residents below the federal poverty level (FPL) in the census tracts where the home addresses of confirmed cases were located. Census tract FPL data were available for 18,090 (93%) of these confirmed cases.[1] Of these cases, 24% were from tracts with <10% of residents below FPL, 34% were from tracts with 10% to <20% below FPL, 25% were from tracts with 20% to <30% below FPL, and 18% were from tracts with 30% to 100% below FPL. **Table 2** also displays these data as age-adjusted rates per 100,000 in the population. These age-adjusted rates indicate a social gradient in confirmed cases whereby those living in the highest poverty areas had the highest population rate of confirmed cases (263 per 100,000), followed by those in the second highest poverty areas (213 per 100,000), the third highest poverty areas (170 per 100,000) and the lowest poverty areas (137 per 100,000). These differences by area poverty assume that missing data on the census tract FPL of confirmed cases is randomly distributed across all confirmed cases, regardless of where they live. This assumption is likely to hold given the relatively small proportion of missing census tract FPL data for confirmed COVID-19 cases.

| Table 2: Confirmed COVID-19 Cases by Census Tract Poverty Level, Age-Adjusted Rates, through April 26th* (N=19,516) | | | | |
|---|---|---|---|---|
| **Area Poverty** | **N** | **%** | **Age-Adjusted Rate per 100,000** | **95% CI** |
| <10% area poverty | 4,327 | 23.9% | 136.8 | (132.7-140.9) |
| 10% to <20% area poverty | 6,144 | 34.0% | 169.5 | (165.3-173.8) |
| 20% to <30% area poverty | 4,453 | 24.6% | 213.1 | (206.8-219.3) |
| 30% to 100% area poverty | 3,166 | 17.5% | 262.6 | (253.4-271.7) |
| Unknown/Missing* | 1,426 | | | |
| *Area poverty level data were missing for 7.3% of cases. | | | | |

## COVID-19 Deaths by Race/Ethnicity and Socioeconomic Status

Through April 26th, 2020, there were a total of 883 confirmed COVID-19 deaths in Los Angeles County (**Table 3**).[1] Race/ethnicity data were available for 865 (98%) of these deaths. Of these, 37.1% were Latino, 28.2% were white, 18.4% were Asian, 13.8% were African American, 1.3% were Native Hawaiian or other Pacific Islanders, 0.1% were American Indian or Alaska Natives, and 1.2% identified as another race/ethnicity.[2] **Table 3** displays these data as age-adjusted rates per 100,000 in the population. Native Hawaiians or other Pacific Islanders had the highest population rate of COVID-19 deaths (71 per 100,000), followed by African Americans (13 per 100,000), Latinos (10 per 100,000), Asians (8 per 100,000), whites (6 per 100,000) and American Indian or Alaska Natives (3 per 100,000). These differences in rates assume that missing data on the race/ethnicity of COVID-19 deaths are randomly distributed across all deaths, regardless of their race/ethnicity. This assumption is likely to hold given the relatively small proportion of missing race/ethnicity data for COVID-19 deaths.

| Table 3: Confirmed COVID-19 Deaths by Race/Ethnicity, Age-Adjusted Rates, through April 26th* (N=883) | | | | |
|---|---|---|---|---|
| **Race/Ethnicity** | **N** | **Non-Missing %** | **Age-Adjusted Rate per 100,000** | **95% CI** |
| Asian | 159 | 18.4% | 7.9 | (6.7-9.1) |
| African American | 119 | 13.8% | 13.2 | (10.8-15.6) |
| Latino/Hispanic | 321 | 37.1% | 9.8 | (8.7-10.8) |
| American Indian or Alaska Native | 1 | 0.1% | 2.9 | (-2.8-8.6)^ |
| Native Hawaiian or Other Pacific Islander | 11 | 1.3% | 71.0 | (29.0-112.9)^ |
| White | 244 | 28.2% | 5.7 | (4.9-6.4) |
| Other | 10 | 1.2% | | |
| Unknown/Missing* | 18 | | | |
| *Race/ethnicity data were missing for 2.0% of deaths.<br>^Age-adjusted rate and confidence interval should be interpreted with caution due to a small number of deaths. | | | | |

Area poverty data were available for 875 (99%) of COVID-19 deaths through April 26th.[1] Of these deaths, 25% were from tracts with <10% of residents below FPL, 32% were from tracts with 10% to <20% below FPL, 25% were from tracts with 20% to <30% below FPL, and 18% were from tracts with 30% to 100% below FPL (**Table 4**). **Table 4** also displays these data as age-adjusted rates per 100,000 in the population. These age-adjusted rates indicate a social gradient in COVID-19 deaths, whereby those living in the highest poverty areas had the highest death rate (16.9 per 100,000), followed by those in the second highest poverty areas (11.9 per 100,000), the third highest poverty areas (7.9 per 100,000) and the lowest poverty areas (5.5 per 100,000). These differences by area poverty assume that missing data on the census tract FPL of COVID-19 deaths are randomly distributed across all deaths, regardless of home address. This assumption is likely to hold given the relatively small proportion of missing census tract FPL data for COVID-19 deaths.

| Table 4: Confirmed COVID-19 Deaths by Census Tract Poverty Level, Age-Adjusted Rates, through April 26th* (N=883) | | | | |
|---|---|---|---|---|
| Area Poverty | N | Non-Missing % | Age-Adjusted Rate per 100,000 | 95% CI |
| <10% area poverty | 214 | 24.5% | 5.5 | (4.8-6.2) |
| 10% to <20% area poverty | 283 | 32.3% | 7.9 | (7.0-8.8) |
| 20% to <30% area poverty | 219 | 25.0% | 11.9 | (10.3-13.5) |
| 30% to 100% area poverty | 159 | 18.2% | 16.9 | (14.2-19.5) |
| Unknown/Missing* | 8 | | | |
| *Area poverty level data were missing for 0.9% of deaths. | | | | |

## COVID-19 Testing and Testing Requests by Race/Ethnicity and Socioeconomic Status

As of April 26th, 2020, a total of 123,737 individuals were reported as having been tested for COVID-19 in LA County.[1] Race/ethnicity data were available for 39,801 (32.2%) of individuals tested. Of tested individuals with available race/ethnicity data, 30.3% were white, 16.7% were Latino, 9.2% were African American, 8.6% were Asian, 3.1% were Native Hawaiian or other Pacific Islanders, 0.2% were American Indian or Alaska Natives, and 30.3% identified as another race/ethnicity.[2] Age-adjusted population rates of testing by race/ethnicity were not calculated due to the high proportion of missing race/ethnicity data on those tested.

Area poverty data were available for 91,775 (74.2%) of COVID-19 tests through April 26th. Of these tests, 35% were from tracts with <10% of residents below FPL, 36% were from tracts with 10% to <20% below FPL, 19% were from tracts with 20% to <30% below FPL, and 11% were from tracts with 30% to 100% below FPL (**Table 5**). **Table 5** also displays these data as age-adjusted rates per 100,000 in the population. These age-adjusted rates indicate a social gradient in COVID-19 tests conducted, whereby those living in the highest testing rate (805 per 100,000), followed by those in the second highest poverty areas (829 per 100,000), the third highest poverty areas (915 per 100,000) and the lowest poverty areas (1,045 per 100,000). These differences by area poverty assume that missing data on the census tract FPL of COVID-19 tests are randomly distributed across all tests completed, regardless of home address.

| Table 5: Persons Tested for COVID-19 by Census Tract Poverty Level, Age-Adjusted Rates, through April 26th* (N=123,737) | | | | |
|---|---|---|---|---|
| Area Poverty | N | Non-Missing % | Age-Adjusted Rate per 100,000 | 95% CI |
| <10% area poverty | 31,620 | 34.5% | 1045.1 | (1033.5-1056.6) |
| 10% to <20% area poverty | 32,692 | 35.6% | 915.4 | (905.5-925.4) |
| 20% to <30% area poverty | 17,374 | 18.9% | 828.9 | (816.6-841.3) |
| 30% to 100% area poverty | 10,089 | 11.0% | 804.7 | (789.0-820.4) |
| Unknown/Missing* | 31,962 | | | |
| *Area poverty level data were missing for 25.8% of persons tested; this does not include tests not reported in the Electronic Lab Reporting system or an unknown number of persons tested from Long Beach and Pasadena. | | | | |

To facilitate access to free COVID-19 testing in LA County, the City and County of LA launched a web-based testing portal on March 23rd, 2020. Through this portal, LA County residents can request a free COVID-19 test and receive a referral for a testing appointment at one of 35 community-based testing sites. A total of 41,344 test requests were made to the COVID-19 portal through April 21st, 2020. Race/ethnicity data were available for 39,454 (95.5%) of these requests. **Figure 2** shows data on percentages of all tests requested for which race/ethnicity data were available compared to their percentages in the total LA County population. Of all test requests with available race/ethnicity data, 47.9% were requested by Latinos, 25.1% were requested by whites, 14.4% were requested by Asians, 9.2% were requested by African Americans, 1.1% were requested by Native Hawaiians or other Pacific Islanders (NHOPI), 0.3% were requested by American Indians or Alaska Natives (AI/AN), and 1.9% were requested by those identifying as another race/ethnicity .[2] The racial/ethnic distribution of testing requests on the COVID-19 portal was almost identical to the racial/ethnic distribution of the population of LA County, with some over-representation in NHOPI and under-representation in AI/AN.



Figure 2: COVID-19 Test Requests via the LA Portal by Race/Ethnicity* compared to Population Percentages, through April 21st (N=41,344)

*Race/ethnicity data were missing for 4.5% of test requests.

LA County 211 began taking calls for COVID-19 testing requests in early April, shortly after the launch of the LA City/County COVID-19 testing portal. Thus, 211 serves as an alternative point of entry to the COVID-19 testing portal for people without internet access or who prefer to use the phone. 211 began collecting race/ethnicity data on these calls on April 23rd. Data on the race/ethnicity of callers requesting tests via 211 for the week of April 23rd – April 27th are displayed in **Figure 3**. The percentages of test requests from Latinos and African Americans were higher that the percentages of Latinos and African Americans in the LA County population. The percentages of test requests from Asians and whites were lower than the percentages of Asians and whites in the LA County population.



**Figure 3: COVID-19 Test Referrals via 211 by Callers' Race/Ethnicity\* compared to Population Percentages, through April 27th (N=707)**

*Race/ethnicity data were missing for 8.8% of 211 calls.

## DHS COVID-19 Positive Patients Hospitalized, Placed in ICU, and Average Length of Stay by Race/Ethnicity

As of April 25th, 2020, a total of 402 COVID-19 patients had been hospitalized in DHS facilities. Data on race/ethnicity were available for 375 (93.3%) of these patients. Of these, the majority were Latino (69.1%) (**Table 6**). As a point of comparison, in 2019, 64.2% of all hospitalized patients in DHS facilities were Latino. The percentages of COVID-19 hospitalized patients admitted to the ICU varied by race/ethnicity, with 30.4% of Asians, 28.6% of African Americans, 29.7% of Latinos, and 11.1% of whites admitted (**Figure 4**). However, the numbers of non-Latino hospitalized COVID-19 patients were so small that these racial/ethnic differences in ICU admissions should be interpreted with caution.

| Table 6: COVID-19 Cases with Race/Ethnicity\* Hospitalized in DHS Facilities, through April 25th | | |
|---|---|---|
| **Race/Ethnicity** | **Count** | **% of Hospitalizations** |
| **American Indian or Alaska Native** | 0 | 0.0% |
| **Asian** | 23 | 6.1% |
| **African American** | 21 | 5.6% |
| **Latino/Hispanic** | 259 | 69.1% |
| **White** | 9 | 2.4% |
| **Other** | 63 | 16.8% |
| **Total** | 375 | |

*Race/ethnicity data were missing for 6.7% of hospitalized COVID-19 patients in DHS facilities.

8



*Race/ethnicity data were missing for 7.6% of hospitalized patients admitted to the ICU in DHS facilities.

**Table 7** displays data on length of COVID-19 hospital stays (LOS) in DHS facilities, by age group, for patients discharged by April 25th, 2020. Data on ages were available for 100% of hospitalized patients. The longest average LOS was for patients aged 65+ (6.6 days). The second longest average LOS was for patients aged 35-44 and 45-54 (5.7 days for both).

| Table 7: Length of Stay for DHS Hospitalized COVID-19 Positive Patients Who Have Been Discharged, by Age Group*, as of April 25th | | | |
|---|---|---|---|
| **Age Group** | **Number of Patients** | **Length of Stay (Days)** | |
| | | **Average** | **Range** |
| **5-14** | 3 | 2.7 | 2 to 4 |
| **15-17** | 0 | n/a | n/a |
| **18-24** | 5 | 2.1 | 1 to 4 |
| **25-34** | 25 | 3.6 | 1 to 17 |
| **35-44** | 47 | 5.7 | 1 to 37 |
| **45-54** | 69 | 5.7 | 1 to 29 |
| **55-64** | 78 | 4.8 | 1 to 26 |
| **65+** | 70 | 6.6 | 1 to 21 |
| **Total** | 297 | 5.4 | 1 to 37 |

*Age group data were not missing for any discharged patients.

**Table 8** displays data on length of COVID-19 hospital stays in DHS facilities, by race/ethnicity, for patients discharged by April 25th, 2020. The table shows racial/ethnic differences in LOS that are similar to the difference for admission to ICU (**Figure 4**) in that Asians had longer average LOS (6.0 days) and whites had shorter LOS (2.7 days) than African Americans and Latinos (3.6 and 5.1, respectively). This would be expected given that hospitalizations requiring ICU admissions tend to be longer in duration. However, as before, given the relatively small number of DHS COVID-19 hospitalizations among non-Latino patients, these racial/ethnic differences in LOS should be interpreted with caution.

| Table 8: Length of Stay for DHS Hospitalized COVID-19 Positive Patients Who Have Been Discharged, by Race/Ethnicity*, as of April 25th | | | |
|---|---|---|---|
| | | Length of Stay (Days) | |
| Race/Ethnicity | Number of Patients | Average | Range |
| Asian | 17 | 6.0 | 1 to 26 |
| African American | 15 | 3.6 | 1 to 8 |
| Latino/Hispanic | 194 | 5.1 | 1 to 37 |
| White | 8 | 2.7 | 1 to 9 |
| Other | 44 | 7.5 | 1 to 26 |
| Unknown | 19 | 8.1 | 1 to 29 |
| Total | 297 | 5.4 | 1 to 37 |

*Race/ethnicity data were missing for 6.4% of discharged patients.

## Data Limitations and Efforts to Address these Limitations

The relatively high proportion of COVID-19 tests and confirmed cases with missing data on race/ethnicity is the result of several systemic challenges. Since March 9, health care providers have been required to report COVID-19 cases, pursuant to California Code, Title 17, §2500; the required data elements for reporting include race/ethnicity. In addition, California testing labs are required to report data on COVID-19 tests through the state's Electronic Lab Reporting system (ELR). However, required data elements for laboratories reporting in ELR, as outlined in California Code, Title 17, §2505 do not include race/ethnicity. Because health care providers are aware that labs are required by the State to report all COVID-19 testing through the ELR system, they often don't submit their own lab result forms to DPH; if the lab is the only entity reporting, then race/ethnicity data may not be collected for the reason stated above. Even when health care providers do report these cases, these forms do not always have completed data on patient demographics.

To address gaps in race/ethnicity data after ELR and provider forms are received, DPH has included solicitation of information on race/ethnicity in their COVID-19 case follow-up investigations. In addition, DPH conducts weekly matches with the State death record system to fill in missing race/ethnicity data for COVID-19 deaths. DPH has also recently begun receiving data from the LA County Coroner-Medical Examiner (MEC) on results from all post-mortem COVID-19 tests that they conduct. Matching our COVID-19 death files with these MEC data should help fill in gaps in race/ethnicity data for COVID-19 deaths.

## Other Testing, Data Collection and Research Efforts Under Way or Planned by DPH and Academic Partners

DPH, in collaboration with researchers at USC, recently released the results of the first in a planned series of SARS-CoV-2 antibody seroprevalence studies in LA County. The purpose of these studies is to estimate the proportion of the total LA County adult population that has had the infection by testing for antibodies in representative samples of the adult population. The first of these studies estimated an adult seroprevalence of 4.1% (range: 2.8%-5.6%), meaning that an estimated 221,000 to 442,000 LA County adults have had the infection. DPH plans to repeat these seroprevalence studies at least monthly in order to track the spread of the virus over time. While the sample of nearly 900 adults in this first study was selected to represent all major racial/ethnic groups in the county, the sample size was not large enough to estimate statistically significant differences in seroprevalence across these groups. Future studies will increase efforts to ensure greater participation among communities of color and will also include a child component.

Another COVID-19-related research endeavor underway at DPH is designed to track the spread of COVID-19 in skilled nursing facilities to guide efforts to mitigate the impact of COVID-19 on patients in these facilities. Given that over one-third of COVID-19 deaths have occurred in these types of congregate living facilities, these surveillance studies will play an important role in reducing COVID-19 mortality in LA County.

USC recently began fielding a supplement to their *LABarometer* study, a quarterly internet-based survey of approximately 1,800 LA County residents. The supplement consists of weekly data on experiences with and perceptions of COVID-19. USC recently shared raw data with DPH for analysis on the first two waves of this supplement, from April 1-7 and April 8-14. **Figure 5** displays data on perceived likelihood of getting COVID-19 sometime in the next three months, by race/ethnicity. Across the two waves, African Americans had the lowest perceived likelihood of getting COVID-19 (15% and 13%), despite having among the highest rates of COVID-19 confirmed cases and deaths (**Tables 1 and 3**). The survey also collects data on COVID-related symptoms and on economic and mental health impacts. DPH will be analyzing and reporting on these data on an ongoing basis.



*Results for NHOPI and AI/AN racial/ethnic groups were only available for the second wave.

## Summary of Findings and Planned Response

The results of these analyses of LA County COVID-19 data by race/ethnicity status indicate that the rates of COVID-19 confirmed cases and deaths are extremely high among NHOPI and are also higher among African Americans and Latinos than among whites and Asians. The lower rate of cases and deaths among AI/AN should be viewed with caution as the numbers are small and, consequently, small inaccuracies in the data (e.g., AI/AN misclassified as Latino) could produce large errors in the results.

There is also a clear social gradient in the data on cases and deaths indicating that as relative income decreases, rates of confirmed cases and deaths increase. However, the data on COVID-19 testing indicate a social gradient in the opposite direction. As relative income increases, the rate of testing increases. These trends are of great concern and suggest that more affluent residents have better access to COVID-19 testing and treatment services, even as the rates of infection appear to be higher in lower income communities.

The findings highlight the urgent need for more intensive efforts to expand culturally competent testing, treatment, and prevention strategies in the African American, Latino and NHOPI populations as well as in low income communities overall. Public Health is currently developing a proposed plan for addressing these inequities that is attached as an appendix to this report.



# Strategies for Addressing COVID-19 Disparities in Health Outcomes Among Highly Impacted Populations
## Revised 4/28/2020

## Background & Epidemiology

The Centers for Disease Control and Prevention (CDC) has identified an outbreak caused by a novel coronavirus (COVID-19) previously unidentified in humans. Coronaviruses are a large family of viruses that cause disease of varying severities, ranging from the common cold to more severe diseases, such as Severe Respiratory Adult Syndrome (SARS) and Middle East Respiratory Syndrome (MERS). Coronaviruses are zoonotic, meaning that they cause infections that usually exist exclusively in animals, including camels, cats, and bats. Rarely, animal coronaviruses can evolve and infect humans and then spread from person to person, which is the case with MERS and SARS.

Common symptoms of COVID-19 in an infected person include fever, cough, shortness of breath, difficulty breathing, and are being updated as we learn more about this disease.[1] Diagnosis is based on a patient's clinical presentation and diagnostic exams (i.e., throat swabs, chest x-rays). There is no specific treatment or vaccine for the coronavirus.

As of April 27, there have been over 2.8 million cases of COVID-19 worldwide and nearly 199,000 deaths due to the virus.[2] In the United States, there have been more than 957,000 total cases and nearly 54,000 total deaths.[3] In Los Angeles County, to date, we have more than 20,000 cases and 942 deaths.

Preliminary national and local data indicate that COVID-19 has had a disproportionate impact on various communities. For instance, for the 865 people who have passed away in LA County, where race/ethnicity has been identified:

- 14% are African American, despite comprising 9% of LA County's population
- 18% are Asian, despite comprising 15.4% of LA County's population
- 1% are Native Hawaiian or Pacific Islander, despite comprising .4% of LA County's population
- 37% are Latinx, despite comprising 48.6% of LA County's population
- 28% are white, despite comprising 26% of LA County's population
- 1% are another race/ethnicity

---

[1] Centers for Disease Control and Prevention. Symptoms of Coronavirus. Retrieved from https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html
[2] World Health Organization. Coronavirus disease 2019 (COVID-19): Situation Report – 98. Retrieved from https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200427-sitrep-98-covid-19.pdf?sfvrsn=90323472_4
[3] Centers for Disease Control and Prevention. Cases of Coronavirus Disease (COVID-19) in the U.S. Retrieved from https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html



To put these numbers in perspective, when we analyze these numbers as rates per 100,000 people in each of these groups, better comparisons across the population can be made. The death rate among African Americans is 13.2 per 100,000, which is significantly higher than the mortality rate of other races and ethnicities. For people who identify as Latinx, the death rate is 9.8; for people who are Asian, the rate of death is 7.9; and for whites, the death rate is 5.7.

Looking at this data by community poverty levels, people who live in areas with high rates of poverty have three times the rate of deaths for COVID-19 – 16.9 per 100,000 people – compared with communities with very low poverty levels who had a death rate of 5.5 per 100,000.

## COVID-19 & Equity

Historically, communities disproportionately affected by poor health outcomes include Black/African American, Asian American, Native Hawaiian and Pacific Islander (AANHPI), and American Indian/Alaska Native (AI/AN) communities, as well as undocumented populations, frontline low wage workers, people experiencing homelessness (PEH), and justice-involved populations. This disproportionality is primarily the result of longstanding inequities in an array of health determinants, including limited access to health care (especially primary care) and limited access to affordable housing and nutritious foods. The strategies outlined below are intended to close the gaps in the impacts of COVID-19 and will require both targeted and tailored approaches for specific communities. Given our charge to advance the conditions that support optimal health and well-being for all and our commitment to promoting health equity, the Department of Public Health (Public Health) will abide by our health equity principles to:

- Provide inclusive and accessible data. This includes providing data by race and ethnicity and disaggregating data to the best of our abilities for each community, like AI/NA and the diverse AANHPI (Asian American Native Hawaiian and Pacific Islander) population;
- Advance policies designed to stem the spread of disease and promote health, while addressing—or at least acknowledging—possible unintended consequences; and
- Ensure the inclusion of those most impacted and work in partnership to center our most vulnerable populations in our decision making.

Public Health has made good-faith efforts to live by our equity principles and departmental values. We have:

- Publicly disavowed the discrimination and xenophobia experienced by AANHPI communities;
- Articulated why we're seeing the disproportionate number of deaths among Black/African American communities;
- Increased language access by translating many documents into all threshold languages;
- Began reporting COVID-19 case and death data by race and ethnicity when possible; and
- Recently released an FAQ on COVID-19 and Black/African Americans; a targeted PSA is forthcoming.

However, more can be done, and more coordinated approaches are needed to address the disparities in health outcomes related to COVID-19.

## Strategies

In close partnership with other County Departments and community stakeholders, Public Health will work to address the impact of COVID-19 on affected communities. We propose the following strategies for addressing COVID-19 inequities among highly impacted populations:

1. **Ensure access to testing for highly impacted communities.**

   Testing assists in the early detection of COVID-19, timely isolation and contact tracing to prevent its spread, and early case management for individuals. Additionally, testing can support providers in managing care for those with chronic illnesses. Increasing access to and testing of all highly impacted communities is needed considering emerging data shows that Black/African American individuals are disproportionately burdened deaths from COVID-19, Latinx and Asian populations have the next highest death rates from COVID-19, and NHPI (Native Hawaiian and Pacific Islander) communities account for a higher percentage of deaths from COVID-19 relative to their proportion of the total population. Greater inclusion of highly impacted communities in population-level testing will position Public Health, elected officials, and the community to better understand the relationship between prevalence and higher mortality in Black/African American and other highly impacted communities.

   **Recommendations:**
   a. Work closely with the Department of Health Services to make testing ubiquitous and more accessible; expand options beyond mobile testing sites, which require residents to go online and complete an eligibility form to schedule testing.
   b. Testing should be available at clinics, hospitals, and in non-clinical areas in the community, especially those treating highly impacted populations.
   c. All testing performed in non-clinical settings should link persons immediately to care.
   d. Clients should be provided with results so that they can give them to their care provider.
   e. Systems should connect persons who test positive to immediate medical consultation.
   f. Ensure representative sampling of diverse communities in the serology/antibody testing prevalence study.
   g. Testing results along with patient demographic information should be electronically transmitted to the Department of Public Health to ensure appropriate follow-up with positive individuals.

2. **Integrate testing with care coordination for highly impacted communities.**

   In conjunction with improving access to testing for COVID-19, support and collaboration will help partners adopt additional strategies that may improve access to coordinated care for patients. For example, coordinating the care of patients between different points of care and providing tailored information to ensure that primary care providers recognize the higher risk of death from COVID-19 for highly impacted communities.

3. **Ensure access to potential treatments at care sites accessible to highly impacted communities.**

   Although no specific treatments for COVID-19 exist at this point, Public Health and healthcare providers should ensure highly impacted communities stay abreast of the latest news about

medications, vaccines, and other therapeutics that may aid in the prevention and care of COVID-19.

**Recommendations:**

a. Seek input from community members to develop culturally and linguistically appropriate education and information on the potential benefits of participating in any clinical trials to evaluate possible treatments for COVID-19 and vaccines being developed to protect against COVID-19. It should be noted that based on preliminary discussion with key informants, a discussion of clinical trials with the community will face significant resistance and acceptance. Input is needed to determine appropriate messaging about clinical trials.

b. Ensure access to clinical trials/treatment for communities of color where they seek and receive care.

c. Prioritize high impacted groups to gain access to medications and vaccines, once approved, based on documented higher risk for serious illness and death.

## 4. Facilitate access to other supportive resources.

As Public Health issues Health Officer Orders for quarantine or isolation, staying home except when conducting essential activities and other recommendations, such as wearing cloth face coverings, highly impacted populations may encounter additional needs or challenges in effectively following preventative measures or recommendations. Thus, there is a need to identify the community's needs and to link individuals to supportive resources.

**Recommendations:**

Work with local partners to ensure:

a. Availability of housing options for those that test positive for COVID-19 but live in overcrowded residential settings where it is difficult to implement isolation or quarantine guidelines;

b. We understand the needs of highly impacted populations (e.g., re-entry population returning to communities while social services and support agencies provide limited services or are closed to the public or pathways to housing and wrap-around services for persons experiencing homelessness);

c. Wide use of validated resource lists or databases (e.g., One Degree or 211) to assist community members in finding resources related to food, shelter, financial support, housing, etc.;

d. Special procedures for highly impacted populations at businesses and institutions (e.g., responsive business hours that meet the needs of high-risk and highly impacted populations);

e. Translation of the *COVID-19 – Guide for Immigrant Californians* which lists assistance available to immigrant individuals and their families in LA County, into our threshold languages; and

f. Materials and supplies are available (e.g., hand sanitizer for local agencies).

5. **Continue to support local and national policies that alleviate the burden of this disease and promote more equitable investment in our communities**.

   **Recommendations:**
   a. Support existing policy change efforts like paid sick leave for all workers, better access to health care and insurance, increased access to telehealth and telemedicine for hard to reach and geographically isolated individuals, and more protections and resources for undocumented communities and those employed under "Compact of Free Association (COFA)" work authorization agreements.
   b. Support opportunities to invest in and strengthen CBOs serving highly impacted and underserved communities, particularly if there is economic hardship following COVID-19 impact.

6. **Include community voices in our response and recovery plans and develop community-specific action plans to implement recommendations where possible.**

   **Recommendations:**
   a. Engage community voices in developing response and recovery plans for COVID-19. Public Health has existing relationships with committees, including the Community Prevention and Population Health Task Force, Center for Health Equity Data Advisory Committee, the Public Health Youth Advisory Committee, the Asian American, Native Hawaiian, and Pacific Islander Health Initiative, and other community leaders. These entities can act as both ambassadors and liaisons to other stakeholders and share concerns from highly impacted community members.
   b. Review input/recommendations already received from the community. Advocacy groups have sent letters stating their concerns with the disproportionate impact on their communities and potential solutions. These recommendations should be acknowledged, implemented when possible, and the challenges and barriers that prevent their implementation identified and communicated to the community.

   ***The Black Equity Initiative "Open Letter to Philanthropy and Government Leaders: Equity Meets Its Moment"*** *(see attached for the full letter):*
   1. *Use Public Health platform to speak about systemic harm to Black people and advocate for equity-based investments;*
   2. *Track the flow of dollars from institutions to Black-led-and-serving organizations;*
   3. *Increase investments in Black CBOs by at least 25%, in line with the recommendations made in 2017 by the Association of Black Foundation Executives (ABFE);*
   4. *Fully fund public departments and commissions tasked with anti-discrimination and racial equity enforcement (e.g., Office of Racial Equity, Civil and Human Rights Ordinance, Equity and Targeted Student Achievement, Perinatal Equity Initiative/Black Infant Health, among others);*

5. *Take an institution-and-infrastructure-building approach to funding nonprofits, recognizing strong Black-led institutions, alliances, coalitions, groups, and individuals are more important than ever.*

***The LA County/City Native American Indian Commission (LANAIC) letter in support of the motion, "-Ensuring Collection of Full Racial and Ethnic Data COVID-19 Patients throughout LAC"*** *(see attached for the full letter):*

1. *Collect race and ethnic data for all COVID-19 testing, reported cases, and related fatalities;*
2. *Share race and ethnic data for high-risk individuals housed in emergency shelters;*
3. *Collect race and ethnic data upon testing, hospital admission and any other healthcare interaction related to COVID-19. Collection efforts should prioritize self-reported race;*
4. *Use the following definitions of AI/NA for reporting:*
   a. *Those who identify as AI/NA alone*
   b. *Those who identify as AI/NA alone and in combination with other races*
   c. *Those who AI/NA who identify as Hispanic*
5. *Work collaboratively with the LANAIC, local AI/NA data experts, and AI/AN-serving organizations when collecting and reporting AI/NA health data.*

***The Asian American, Native Hawaiian and Pacific Islander (AANHPI) Health Collaborative*** *(see attached for the full letter):*

1. *Improve accessibility, outreach, and translation of COVID-19 materials and information for AANHPI communities;*
2. *Improve disaggregated data coordination, collection, and coding among various AANHPI ethnicities;*
   a. *Engage and partner with existing AANHPI researchers and epidemiologists who have experience in disaggregating and developing models for AANHPI data to improve surveillance for communicable diseases, such as COVID-19; and*
   b. *Form an Asian & Pacific Islander Task Force prioritizing COVID-19 needs of communities by making recommendations to the Board of Supervisors, the Health Agency, and Public Health on policies and practices to improve health in Los Angeles County. One of the key tasks of the Task Force can be to focus on the recommendations listed above.*
3. *More specific issues and proposed solutions are included in the letter.*

## 7. **Provide more inclusive data collection, reporting, and deeper analyses to understand the unique risk and preventive factors among highly impacted communities**.

These actions are critical to informing and shaping the interventions needed to reduce the negative health impacts of COVID-19. More in-depth analyses would require further examination of factors such as the community and individual levels of access to care, underlying conditions that increase risk, clinical course among those that died, hospital admissions, and environmental and health equity factors (e.g., income, residence, education, employment status, or type of employment/ exposure level to COVID-19).

Per a Board Motion on April 13, 2020, Public Health has been tasked with collecting full racial and ethnic data, including a breakdown by age groups and socioeconomic status across all testing sites.  Frequent updates will be provided to the Board offices and will be posted on the Public Health website.

## 8. Contact tracing and tracking

Contact tracing is the practice of identifying and monitoring individuals who may have had contact with an infectious person. This work is critical to control the spread of a communicable disease such as COVID-19. These efforts can be time and labor intense as they require interviewing skills, emotional intelligence, and oftentimes, multi-language capacity. As the number of cases rises, so will the need for knowledgable and trusted personnel to conduct this essential work.

### Recommendations:
a. Work with trusted partners/CBOs in contact tracing for hard-to-reach populations; and
b. Increase the number of culturally competent interviewers in AA/Latino populations that are more at risk. Consider using Public Health Investigators who are skilled interviewers of at-risk groups.

## 9. Strengthen a tailored communication strategy to increase language access and conduct more robust outreach, education, and engagement.

Information should be accurate, culturally, and linguistically appropriate, action-oriented, timely, and accessible.

### Recommendations:
a. Materials should continue to provide accurate information, including attention to dispelling myths and rumors (could leverage Health Education Administration to maintain and update materials).
b. Information/education should include how and when to access testing, clinical care, and resources, with specific attention to the needs in highly impacted communities.
c. Engage community partners and leaders (e.g., focus groups, discussions, interviews) to seek input and refine health messages for specific communities; community leaders should be engaged to help create messaging and assist with the timing of releasing information.
d. Partner with organizations/leaders trusted by the community (e.g., faith leaders, non-English media, and community agencies) to share key health messages.
e. Communicate and collaborate with ethnic and diverse media outlets to disseminate information, including translating press releases in more languages for ethnic media.
f. In addition to using traditional media (e.g., billboards, bus stops, PSAs), partner with others, and use non-traditional communication strategies (e.g., social media).
g. Information must be timely. For example, before lifting Safer at Home orders,
   - provide clear guidelines and communications on what individuals can do to protect themselves and others;

- explain rationale that Orders were in place to ensure the healthcare system would not be overburdened;
- institutions must also have clear guidelines on how to maintain mitigation efforts.

h. Launch a data-driven systematic education/awareness campaign one week before lifting stay at home order.

- An awareness campaign should inform the population regarding who is at high risk for serious illness (e.g., the 20% who have bad outcomes); provide information regarding who is at high risk based on data collected on hospitalized patients and those that have died (e.g., types of underlying health conditions such as type of disease, BMI, smoking, vaping, or other factors).
- Business owners, schools, service providers, persons who live with persons at high risk, and relatives of persons at high risk should understand who the highly impacted populations are.
- The awareness campaign should educate that wearing face masks reduces the spread of COVID to others and that you need to take additional measures to protect yourself (e.g., 6ft AND more, wash your hands for 20 seconds, stay at home) to reduce the risk of being infected.

## Next Steps

**Expand access to COVID-19 Polymerase chain reaction (PCR) testing and health care services among highly impacted populations through partnerships with local providers and CBOs.**

- Working with DHS to expand community testing sites in underserved communities
- Implementing a broader testing strategy at Skilled Nursing Facilities
- Planning with Federally Qualified Health Centers (FQHCs) and community providers to improve access to needed care and support

**Develop work plans, beginning with focus group feedback, for specific populations, including:**

- Blacks/African Americans
  Based on earlier data preliminarily indicating a greater risk of death from COVID-19 for African Americans, the following steps have already been taken or are in progress:
  - Released an FAQ and flyers on COVID-19 and African American communities;
  - Participated in radio interviews related to the data findings and African Americans; and
  - Recording COVID-19 Public Service Announcements (PSAs) for the African American community, after receiving feedback from a focus group.
- Asian American Native Hawaiian And Pacific Islanders
- Native Americans Indians
- Latinx
- Undocumented Populations
  - The Los Angeles County Office of Immigrant Affairs (OIA) released both a poster for the uninsured and an FAQ on Coronavirus for Immigrants.

**Finalize the development of a virtual "Town Hall for Action."**

- In partnership with The California Endowment and LA Care
- To invite and lift actionable strategies to prevent, mitigate, and control COVID-19 spread in populations already disproportionately impacted



April 14, 2020
From: The Undersigned Black-led-and-serving Organizations

*An Open Letter to Philanthropy and Government Leaders: Equity Meets Its Moment*

Just three weeks into research on the myriad ways in which the novel coronavirus is devastating communities across this country a story is emerging that is not novel: Black people are dying at disproportionate rates across the country. At this early stage in the U.S. COVID-19 crisis, the stark racial disparity in death rates is linked to disparities in underlying health and economic conditions that increase the likelihood of death as a result of COVID-19. These health conditions—our conditions—are rooted in a history of being denied access to quality food, medical treatment, and the physiological stress of intergenerational racial terror.

As this epidemiological crisis continues, you should expect to hear stories suggesting that even when controlling for underlying health conditions, Black people are still dying from COVID-19 at disproportionate rates. Hidden in the statistics are questions none of us can ignore: how are Black people treated by nurses and physicians when seeking treatment for symptoms of COVID-19? How does race factor into the question of who lives or dies?

You should also expect to hear stories about Black people, particularly poor Black people, bearing the brunt of the severe economic dislocation caused by this pandemic. Yet, as funders and government leaders, you should not wait until these stories hit the front pages of our leading newspapers. You know the history. You know the ***right now***. You should act immediately to robustly support those community-based organizations that empower Black Californians to both survive and challenge inequitable conditions.

In 2011, UCLA Luskin School of Public Affairs reported in its Annual State of the Sector Report that 39% of nonprofit organizations that disbanded between 2002—2011 in LA County served neighborhoods where more than 20% of the population lived in poverty and more than 40% of the residents were African American.

Data published by the Philanthropic Initiative for Racial Equity in 2017 revealed the proportion of annual grant money for African Americans decreased by 4.3% between 2005-2014, the highest decrease of any POC group over the same time period.

In its 2018 report, *The Racial Wealth Gap*, the California Budget and Policy Center detailed how government-sponsored policies and discriminatory practices have driven the racial wealth gap, where in 2014, the median value of liquid assets for white households in Los Angeles was $110,000, compared to $200 for US-born black households.

That same year, the LA County Department of Public Health Center for Health Equity published its action plan for birth equity, in which racism and its impact on life outcomes was the clear and determinant public health factor impacting Black infant and maternal death.

In 2019, the LA Homeless Service Authority declared in its groundbreaking report on Black people and homelessness: *Structural racism, discrimination, and unconscious bias in housing,*

*employment, criminal justice, and child welfare policies have led to overrepresentation of Black people experiencing houselessness.*

Data is clear: racial injustice continues to serve as a destructive force in society, undermining our economy, humanity and self-professed values of liberty and justice for all.

As Black-led-and-serving organizations, we are on the frontlines. We live the truth of inequity: that Los Angeles, the Inland Empire, and indeed, the nation, have historical legacies rooted in institutional and systemic racism; that our communities have been harmed by oppression and neglect.

Progress on Black equity and racial justice must be part of any forward movement in the United States, and it will only be achieved when philanthropic investments, public policies, and institutional practices boldly confront racial injustice.

Now is the time to double and triple down on eradicating it. Now is when equity gets put to the test. And now is the time to make good on your word: equity matters.

**This begins with a commitment to invest in Black community organizations.**

Why? Because Black communities continue to be the canary in America's social and economic mine. From poor performing schools to predatory lending practices, our community experiences the pain first. Our communities have had to withstand the unnecessary loss of lives due to failed public policies and racial bigotry. At the same time, we are the pioneers of social justice resistance and transformative innovation. When reflecting on anti-terror lynching movements of the NAACP to the Black Panther Party's free lunch and clinic programs to LA CAN's COVID-19 sanitation centers in Skid Row, our community's first responders have been leading the way in showing government and NGOs alike how to care for the needs of people rather than discard the people all together. We are more than CBOs: we are family. Some of us have lost members of our natural family to COVID-19 while coming to the aid of our community families. That is why we cannot be silent in this moment.

The one thing you, as philanthropic and government leaders can control in this crisis, is how we will be better when it's over.

As funders and public officials, we call on you to act with the fierce urgency of now. We call on you to:

- Use your voice and public platform to speak about systemic harm to Black people and advocate for equity-based investments
- Commit to rigorously tracking the flow of dollars from your institution to Black-led-and-serving organizations
- Increase investments in Black CBOs by at least 25%, in line with the recommendations made in 2017 by the Association of Black Foundation Executives (ABFE)
- Fully fund public departments and commissions tasked with anti-discrimination and racial equity enforcement (e.g., Office of Racial Equity, Civil and Human Rights Ordinance, Equity and Targeted Student Achievement, Perinatal Equity Initiative/Black Infant Health, among others)
- Take an institution-and-infrastructure-building approach to funding nonprofits, recognizing strong Black-led institutions, alliances, coalitions, groups and individuals are more important than ever.



Our collective work is both timeless and urgent. Disrupting systemic oppression cannot wait, nor can our response be colorblind or race neutral when the outcomes are not. Lives are at stake.

We **can** design an equitable recovery. For the sake of our shared humanity, we must.

In community,

Executive Directors (signed below)
*The undersigned organizations are part of the Black Equity Initiative (BEI) and the African American Infant and Maternal Mortality (AAIMM) Initiative. Black executive directors denoted by \*.*

<u>*Black Equity Initiative*</u>
*Susan Burton\*, A New Way of Life Re-Entry Project*
*John Kim, Advancement Project California*
*Sam Lewis\*, Anti-Recidivism Coalition*
*Janette Robinson Flint\*, Black Women for Wellness*
*Dina Walker\*, BLU Educational Foundation—San Bernardino*
*Charisse Bremond Weaver\*, Brotherhood Crusade*
*Mary Sutton, Collective REMAKE*
*Alberto Retana, Community Coalition (CoCo)*
*Jessica Ellis, Centinela Youth Services*
*Rev. Sam Casey\*, Congregations Organized for Prophetic Engagement (COPE)—San Bernardino*
*Jeffery Wallace\*, LeadersUp*
*Janel Baily\* and LaTonya Harris\*, Los Angeles Black Worker Center*
*Pete White\*, Los Angeles Community Action Network (LA CAN)*
*Areva Martin\*, Special Needs Network*
*Gloria Walton\*, Strategic Concepts in Organizing and Policy Education (SCOPE)*
*Tremaine Mitchell\*, Youth Action Project—San Bernardino*

<u>*African American Infant and Maternal Mortality (AAIMM) Initiative*</u>
*Michelle Fluke, Antelope Valley Partners for Health*
*Janette Robinson Flint\*, Black Women for Wellness (also a BEI organization)*
*Sonya Young Aadam\*, California Black Women's Health Project*
*Dr. Sayida Peprah, PsyD\*, Diversity Uplifts*
*Wenonah Valentine\*, iDREAM for Racial Health Equity, a project of Community Partners*
*Kimberly Durdin\* and Allegra Hill\*, KindredSpaceLA and Birthing People Foundation*



# LOS ANGELES CITY/COUNTY
# NATIVE AMERICAN INDIAN COMMISSION

 

**Chairperson**
CHRISSIE CASTRO
*Navajo*

**Vice Chairperson**
RUDY ORTEGA JR.
*Fernandeño Tataviam*

**Treasurer**
SHAWN IMITATES-DOG
*Choctaw/Lakota*

**Secretary**
PAT LOPEZ
*Taos Pueblo/Tiwa*

ANDREA N. GARCIA, M.D.
*Mandan, Hidatsa, Arikara*

ALLISON HICKS
*Prairie Band of Potawatomi
Nation/Choctaw*

DAWN JACKSON
*Saginaw Chippewa*

FRED LEAF
*Potawatomi*

RANDALL MURPHY
*Choctaw/Lakota*

TRACY PEREZ
*Navajo*

JOSEPH A. QUINTANA
*Kewa Pueblo*

TED TENORIO
*Tiguan Nation*

CHERI THOMAS
*Quinault/Yurok*

**Executive Director**
ALEXANDRA VALDES
*Tlingit/Athabascan*

April 13, 2020

LA County Board of Supervisors
500 W. Temple
Los Angeles, CA 90012

Dear Honorable Members of the Board of Supervisors,

The Los Angeles City/County Native American Indian Commission (LANAIC) is writing to lend our support for the proposed LA County Board Motion *Ensuring Collection of Full Racial and Ethnic Data of COVID-19 Patients throughout Los Angeles County (April 14, 2020).*

The potential impacts of the COVID-19 crisis could be catastrophic for the American Indian and Alaska Native (AIAN) population residing in Los Angeles County (LAC). AIANs are at increased risk of severe illness and death caused by COVID-19 due to higher rates of underlying medical conditions such as diabetes, heart disease, lung disease, and other conditions that may lead to a compromised immune system. Furthermore, AIAN mortality rates in LAC from coronary heart disease and diabetes are higher than that of all other races (157.8/100,000 population, and 58.2/100,000 population, respectively). AIAN adults are also more uninsured (29.5% of AIAN adults 18-64) than all other races (22.7%) leaving those who are uninsured particularly vulnerable if they fall ill with COVID-19. Given that an astounding 56% of adult AIAN households report incomes of less than 200% of the Federal Poverty Level, AIANs are particularly vulnerable to the economic consequences of this crisis (LAC DPH Office of Women's Health. Health Indicators for Women in Los Angeles County: Highlighting Disparities by Ethnicity and Poverty Level, January 2017.) A prior Board Motion on AIAN homelessness illuminated a critical lack of data for those AIAN experiencing homelessness; thus there is no way of knowing whether these most vulnerable individuals will get housed in emergency shelters, the extent to which they are represented in the Coordinated Entry System, let alone if they meet high risk criteria.

Comprehensive data by race and ethnicity will be key to understanding how COVID-19 is impacting and potentially worsening health and economic disparities across communities. Data by race and ethnicity will also be important for understanding the extent to which there are disparities in access to and receipt of health and economic relief. Together these data can help shape and target response and relief efforts. LA County must collect this critical data in order to understand the burden of this disease on different populations including the urban AIAN population.

3175 West 6th Street, Los Angeles, California 90020
(213) 738-3241 | Fax (213) 637-9655 | www.lanaic.org | contact@lanaic.org
aferguson@wdacs.lacounty.gov

Data describing AIAN is already underreported, omitted, or highly inaccurate and we must ensure that is not the case with COVID-19. Though the AIAN population is small relative to other ethnic and minority populations, Los Angeles County contains the largest number of AIAN compared to all other counties in the United States (roughly 171,000). Previous AIAN researchers and advocates attempted to address this data issue in 2002 with a motion sponsored by Supervisors Burke and Antonovich that directed multiple county entities to improve data collection for AIAN. Nearly two decades later in October 2019 similar directives were made to various County entities to improve AIAN data collection with the passage of the Board Motion, *Identifying, Supporting and Serving American Indians and Alaska Natives who are at Risk of or Experiencing Homelessness.*

Even with the aforementioned efforts we know that data collection of the AIAN community remains a challenge for LA County. In order to ensure it is collected properly during the COVID-19 crisis we recommend the following:

- That racial data be reported for those tested (to assess for testing disparities), those reported positive, and COVID-19-related fatalities
- That racial data be reported for those high-risk individuals who are housed in emergency shelters
- Mandate that racial data be collected upon testing, hospital admission and any other healthcare interaction related to COVID-19. Collection efforts should prioritize self-reported race.
- That the following definitions of AIAN be reported:
  - Those who identify as AIAN alone
  - Those who identify as AIAN alone and in combination with other races
  - Those who AIAN who identify as Hispanic
- That the Departments of Public Health and Health Services work collaboratively with the LANAIC, local AIAN data experts, and AIAN serving organizations when collecting and reporting AIAN health data

We applaud the Board's effort to understand the disparate effects that COVID-19 may have on underserved communities.

Sincerely,

Chrissie Castro
Chairperson
Los Angeles City/County Native American Indian Commission



Dear Dr. Davis,

While there is appreciation for the current level of in-language materials produced by the LA County Department of Public Health in addition to the in-language services provided by 2-1-1, we are not sure if they are reaching the most vulnerable AANHPI communities as there are limitations to directing those communities to the DPH website, as well as 2-1-1. Looking at recently released COVID-19 death data by the LA County Department of Public Health (as of 4/16/2020), there was a higher percentage of Asian deaths compared to the current county population (17% versus ~14%). We strongly recommend the exploration of the following activities that will maximize the impact of your efforts towards AANHPI communities:

1) Improve accessibility, outreach and translation of COVID-19 materials and information for AANHPI communities.
2) Improve disaggregated data coordination, collection, and coding among various AANHPI ethnicities.
   a) Engage existing AANHPI researchers and epidemiologists who have experience in disaggregating and developing models for AANHPI data
3) Form an Asian & Pacific Islander Task Force prioritizing COVID-19 needs of communities by making recommendations to the Board of Supervisors, the Health Agency, and DPH on policies and practices to improve health in Los Angeles County.
   a) One of the key tasks of the Task Force can be to focus on recommendations listed in this letter.

In addition, a detailed list of COVID-19 outreach recommendations impacting AANHPI communities can be found on page 3 of this letter. This list of issues and potential solutions was put together collaboratively by a diverse set of leaders in our coalition.

**About the AANHPI Health Initiative**

*Our Mission*

The Initiative's mission is to bring AANHPI (Asian American, Native Hawaiian and Pacific Islanders) health issues to the forefront so they can be actively addressed and result in the elimination of health disparities in these communities, with a specific focus on Los Angeles County.

*Core Goals*

- Develop a strong relationship between AANHPI communities and the LA County Dept. of Public Health.
- Advocate for Los Angeles County Dept. of Public Health to recognize, prioritize and address the AANHPI health disparities in this county.
- Consolidate and coordinate the health work our organizations are already doing to eliminate duplication, while also building with our shared resources.
- Analyze and tailor currently-used evidence based strategies to work for the AANHPI communities we serve.

*Membership Includes:*

- Asian American Advancing Justice - Los Angeles
- Asian Americans/Pacific Islanders in Philanthropy - Los Angeles
- Asian Pacific Islander Forward Movement
- Asian Pacific Health Care Venture
- Asian Pacific Policy & Planning Council
- L.A. Walks
- Pacific Islander Health Partnership
- Southeast Asian Community Alliance
- UCI Chao Family Comprehensive Cancer Center, Office of Community Outreach and Engagement
- Jonathan Nomachi
- Ray Niu, American Heart Association H3 Employee Resource Group

In this unprecedented time, we are grateful for the leadership and the maximum effort demonstrated by County leaders such as the LA County Department of Public Health and look forward to further engagement in strengthening targeted outreach to AANHPI communities in LA County.

Respectfully,

Members of the Asian American, Native Hawaiian, Pacific Islander Health Initiative

**Detailed COVID-19 Outreach Recommendations:**

**Overcrowded Housing**
- ○ **Issue:** There are hidden AANHPI populations who do not receive or seek resources through traditional means, such as through Public Departments or CBO's. These include: **"boarding house"** Immigrants and multi-family and multi-generational homes.
    - i. **Solution:** Expand LACDPH's direct/personal outreach methods to better inform these individuals. This includes partnering and funding local CBO's who are most closely connected to the community.
    - ii. **Solution:** Collaborate with ethnic restaurants and grocery networks/owners to help disseminate information to. Many in this population are in the restaurant or grocery industries and word-of-mouth is the best way to reach them.

**NHPI Communities**

- ○ **Issue:** NHPI communities rely heavily on churches, faith-based organizations (FBO), professional groups, and community-based organizations (CBO) to receive updates and resources regarding COVID-19. However, there are concerns that these key community institutions are not receiving timely information related to coronavirus.
    - i. **Solution:** Ensure NHPI FBO's are aware of upcoming press briefings so they are prepared to share with their community members.
    - ii. **Solution:** Develop partnership with NHPI healthcare professional groups on social media as champions and messengers.
    - iii. **Solution:** Create a complete directory for NHPI community-based organizations and faith-based leaders/churches.
- ○ **Issue:** Some NHPI communities lack internet access, and much of what is shared requires internet, email and social media.
    - i. **Solution:** Work with low-cost phone service providers (such as Cricket) to disseminate resources through texts and calls.
    - ii. **Solution:** Focus more on phone-call outreach due to lack of internet access within the community.
- ○ **Issue:** Many NHPI communities fall under the federal "Compact of Free Association (COFA)" work authorization agreements and do not qualify for medi-cal, unemployment, and many social services.
    - i. **Solution:** LADPH to work with other county departments to create a mortarium and enable these communities to access state and county health and social service programs.
- ○ **Issue:** NHPI and African American communities appear to comprise a higher proportion of the deaths, and possibly the proportion of cases, compared to their

percent of the California and Los Angeles population.  NHPIs might be coded incorrectly as Hispanic/Latino and/or Asian. It is unclear how individuals with mixed heritage are coded. Much of how data is coded and collected by race is crucial in understanding how education and information is being accessed

    i.   **Solution**: AANHPI researchers at UCLA, UCI, and across California have been closely monitoring the impacts of COVID-19 in our communities. They have experience in disaggregating AANHPI data and developing models of data collection.  Partner with AANHPI researchers, epidemiologists, and scientists in improving surveillance for communicable diseases, such as COVID-19.

**Community Based Organizations**

- **Issue**: CBO staff are overwhelmed with the amount of COVID-19 digital clutter.
  - i.   **Solution:** A more organized and central place to ease looking up in-language information for staff to share with clients/community members.
- **Issue:** CBOs are meeting demands for in-language and supportive services on: small business relief, applying for unemployment, utilization of public benefits and public charge concerns, COVID-19 questions and testing; distributing care packages to community members who lack access to food, basic necessities (soap, rice, sanitizer, masks, etc)
  - i.   **Solution**: Official County script/quick guide for CBOs and clinic staff to address in-language community questions.
  - ii.   **Solution:** Clarity on eviction moratoriums, rent relief, etc to immigrant communities.
  - iii.   **Solution**: Ability for CBOs to connect with suppliers where they can bulk items to create care packages.
  - iv.   **Solution**: Guidelines/tool-kit in multiple languages on how to safely operate distribution centers offering crucial supplies and services to communities in need.

**General AANHPI Population**

- **Issue:** AANHPI communities do not have access to the most up-to-date or accurate information regarding COVID-19 developments in their respective languages.
  - i.   **Solution:** Translate all press releases and distribute to in-language media in their respective languages.
    - For Chinese, Vietnamese, Filipino, and Korean communities
      - a.   Media, print, broadcast, and radio are effective ways to distribute information to in-language communities. All should have a "city-desk" or "Editor@" email account that will capture all press releases and be distributed by an editor to reporters.

    ii.    **Solution:** Allow DPH presentations/town halls available in multiple AANHPI languages.

    iii.    **Solution**: Leverage relationships with local AANHPI media and radio groups to host in-language COVID-19 segments, PSAs, and resources available by DPH.

    iv.    **Solution:** DPH can outreach to the following essential services to distribute information in multiple languages:

- Food Delivery/School Lunch Programs to update community members in-language.
- Gas stations - many have video monitors and signs at the pump..
- Ethnic grocery stores and Food 4 Less. Many are located in low-income communities

○ **Issue**: Prolonged wait-times to assess need for translator on COVID 19 helpline.

    i.    **Solution**:  Script for 2-1-1 operators to have pre-set in-language messages ready to understand the process of identifying an interpreter to better support their resource questions

EXHIBIT B



# COVID-19 Data by Race/Ethnicity

Updated: October 6, 2020



## COVID-19 Case Rate per 10,000 Population by Race/Ethnicity*

| Race/Ethnicity | Rate |
|---|---|
| Native Hawaiian/ Pacific Islander | 249.77 |
| Latinx | 219.35 |
| Black or African American | 108.26 |
| American Indian or Alaska Native | 98.81 |
| Asian | 84.06 |
| White | 76.13 |
| Multiple Race | 42.05 |

## COVID-19 Death Rate per 10,000 Population by Race/Ethnicity**

| Race/Ethnicity | Rate |
|---|---|
| Native Hawaiian/ Pacific Islander | 7.52 |
| American Indian or Alaska Native | 5.86 |
| Latinx | 5.48 |
| White | 4.96 |
| Black or African American | 4.79 |
| Asian | 3.36 |
| Multiple Race | 1.67 |

\*   41.95%  of cases have unknown Race/Ethnicity and are not shown
\*\* 2.13%  of deaths have unknown Race/Ethnicity and are not shown
       All data excludes incarcerated individuals

Updated: October 6, 2020

## COVID-19 Case Fatality Rate*** (Number of Deaths/Number of Cases)



## COVID-19 Death Percent vs Population Percent by Race/Ethnicity*



*   2.09% of cases have unknown Race/Ethnicity and have been removed from calculations
***Based on Race/ Ethnicity estimates for cases with unknown race/ethnicity
Population estimates derived from California Department of Finance, 2018



# Covid-19 Female Data by Race/Ethnicity

Updated: October 6, 2020

## Female COVID-19 Case Rate per 10,000 Population by Race/Ethnicity *



## Female COVID-19 Death Rate per 10,000 Population by Race/Ethnicity**



\*   38.00%  of cases have unknown Race/Ethnicity and are not shown
\*\*  1.81%  of deaths have unknown Race/Ethnicity and are not shown

Updated: October 6, 2020

## Female COVID-19 Case Fatality Rate*** (Number of Deaths/Number of Cases)

## Female COVID-19 Death Percent vs Population Percent by Race/Ethnicity****

***Based on Race & Ethnicity estimates for cases with unknown Race/Ethnicity

**** 1.81% of deaths have unknown Race/Ethnicity and have been removed from calculations



# Covid-19 Data by Race/Ethnicity for Males

Updated: October 6 , 2020

## Male COVID-19 Case Rate per 10,000 Population by Race/Ethnicity*



## Male COVID-19 Death Rate per 10,000 Population by Race/Ethnicity**



\* 45.71%  of cases have unknown Race/Ethnicity and are not shown
\*\* 2.38%   of deaths have unknown Race/Ethnicity and are not shown

Updated: October 6, 2020

## Male COVID-19 Case Fatality Rate*** (Number of Deaths/Number of Cases)



## Male COVID-19 Death Percent vs Population Percent by Race/Ethnicity****



***Based on Race/ Ethnicity estimates for cases with unknown Race/Ethnicity;
Estimates derived from California Department of Finance, 2018
****   2.38%of deaths have unknown Race/Ethnicity and have been removed from calculations



# COVID-19 Data by Race/Ethnicity

Updated: October 6 , 2020

## COVID-19 Case Percent vs Population Percent by Race/Ethnicity*



*  41.95% of cases have unknown Race/Ethnicity and have been removed from calculations

Population estimates derived from California Department of Finance, 2018

EXHIBIT C



EXHIBIT D



| RACE/ETHNICITY | Daily | Community | Federal Prison in Lompoc | Total (Community & Prison) |
|---|---|---|---|---|
| Hispanic/Latino | 6 | 5353 | 372 | 5725 |
| White | 4 | 898 | 377 | 1275 |
| Asian | 0 | 113 | 51 | 164 |
| Black/African American | 0 | 48 | 145 | 193 |
| American Indian/Native Alaskan | 0 | 6 | 28 | 34 |
| Native Hawaiian or Pacific Islander | 0 | 4 | 1 | 5 |
| Multiracial | 0 | 78 | 1 | 79 |
| Other | 0 | 83 | 0 | 83 |
| Unknown Ethnicity | 5 | 423 | 0 | 423 |
| Unknown Race, Non-Hispanic | 2 | 87 | 0 | 87 |
| Missing | 6 | 1441 | 51 | 1492 |
| Suppressed/Inmate | 0 | — | — | — |
| Totals | 23 | 8534 | 1026 | 9560 |

**SANTA BARBARA COUNTY COVID-19 DASHBOARD**

This data reflects testing reported to the Public Health Department for Santa Barbara County residents.

## Santa Barbara County Public Health Department Daily Status Report

October 16, 2020

# EXHIBIT E



## Cases by Race/Ethnicity

| Race/Ethnicity | Cases | % of Total Cases | % of Population |
|---|---|---|---|
| Hispanic & Latino, Any Race | 1,812 | 45.7% | 22.9% |
| White, Not Hispanic | 1,406 | 35.4% | 68.5% |
| Other & Under Investigation | 557 | 14.0% | - |
| Black or African American | 77 | 1.9% | 2.0% |
| Asian & Pacific Islander | 70 | 1.8% | 4.2% |
| Multiracial | 39 | 1.0% | 3.6% |
| American Indian or Alaska Native | 8 | 0.2% | 1.4% |

**Source:** The county population estimate comes from U.S. Census Bureau (2019) QuickFacts on San Luis Obispo County. https://www.census.gov/quickfacts/fact/table/sanluisobispocountycalifornia/PST045219.

## Cases by Occupation

| Occupation | Cases |
|---|---|
| Craftsman, Construction Workers & Oth... | 593 |
| Higher Education | 475 |
| Unemployed | 428 |
| Educational and Child Care Setting | 360 |
| Office, Management, Sales or Retail | 360 |
| Retired | 296 |
| Incarcerated | 290 |
| Unknown | 277 |

# EXHIBIT F



# EXHIBIT G

