STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JEFFREY M. CHEMERINSKY (Cal. Bar No. 270756)
Assistant United States Attorney
Violent and Organized Crime Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6520
    Facsimile: (213) 894-0141
    E-mail: jeffrey.chemerinsky@usdoj.gov

Attorneys for Applicant
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 20-293-AB |
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | Sentencing Date: July 29, 2022 |
| PAUL GARY WALLACE, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California, hereby submits its position with respect to sentencing for defendant PAUL GARY WALLACE.

//

//

The government's position is based on the attached memorandum of points and authorities, the files and records in this case, including the evidence from trial, and such additional evidence and argument as may be presented at the hearing on this matter.

Dated: July 15, 2022						Respectfully submitted,

								STEPHANIE S. CHRISTENSEN
								Acting United States Attorney

								SCOTT M. GARRINGER
								Assistant United States Attorney
								Chief, Criminal Division


								 */s/ Jeffrey M. Chemerinsky*
								JEFFREY M. CHEMERINSKY
								Assistant United States Attorney

								Attorneys for Plaintiff
								UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

Assaults, robberies, shootings, narcotics trafficking, extortion, witness intimidation, and murders – for decades, these were just some of the ways defendant Paul Gary WALLACE ("defendant") maintained his control, increased his reputation, and generated more and more power within the East Coast Crips ("ECC"). As the leader of the most influential set of the ECC, the "6-Pacc," defendant effectively controlled the ECC and its large swath of territory throughout South Los Angeles. As a "triple OG," a "big homie," and the "boss of bosses," defendant could order violence and commit violence with impunity. And this is exactly what he did.

Defendant wreaked havoc on the community and neighborhoods controlled by the ECC, destroying lives with his violence and gang activity. The impact of his violent conduct on the victims, their families, and the community will be felt for years and, for the most unfortunate, the rest of their lives.

The carnage, violence, and destruction that defendant caused throughout his reign, coupled with the countless arrests, convictions, court interventions, and attempts at rehabilitation, inform the government's recommended sentence. Defendant has proven repeatedly that he has no interest in changing, that he has no regard for the safety of the community, and that he is truly addicted to violence.

The evidence at trial proved defendant participated in at least one violent murder of a rival gang member, as well as numerous other

racketeering acts in furtherance of the ECC and his position within the gang.

Defendant's participation in the murder of Reginald Brown in 2014 was a senseless murder of an unarmed victim, who was washing his car at the time. The murder robbed young children of their father and a wife of her husband.

Undeterred and unrepentant, just over a year ago, in May 2021, while in custody *on this case*, defendant orchestrated the stabbing of another inmate. Indeed, as set forth below, defendant has engaged in such repeated and depraved behavior that the evidence at trial if anything understated his propensity to violence and depravity. For example, in one recording, which was never played at trial defendant bragged about torturing dogs, cutting off their limbs for enjoyment.

Ultimately, defendant was convicted on both in the Indictment, namely, Racketeer Influenced and Corrupt Organizations Conspiracy (18 U.S.C. § 1962(d)), and Discharging, Brandishing, Use and Carry a Firearm During and in Relation to, and Possess a Firearm in Furtherance of, a Crime of Violence (18 U.S.C. § 924(c)). As part of the conspiracy count, defendant was found to have participated in the murder of R.B. – which increased the statutory maximum sentence available for Count 1 to life in prison. Defendant's § 924(c) conviction results in a mandatory prison sentence of 10 years' imprisonment, which must run consecutive to the sentence imposed pursuant to the Sentencing Guidelines.

The United States Probation Office's ("Probation") calculated defendant's Guidelines as a level 43 and that defendant's Criminal History Category is VI. Probation has recommended a sentence of life

plus 10 years.  The government agrees and respectfully recommends a sentence of life imprisonment as to Count 1, and a consecutive sentence of 10 years as to Count 2.  The government believes such a sentence is sufficient but not greater than necessary to accomplish the goals set forth in 18 U.S.C. § 3553(a).

**II.  STATEMENT OF FACTS**

The Court is familiar with the facts from the trial in this matter.  A summary of the relevant facts is also set forth in the Presentence Investigation Report ("PSR"), paragraphs 1-9.[1]

> The East Coast Crips (ECC) gang was a violent street gang that claimed a large portion of South Los Angeles, from approximately 1st Street to 190th Street, between the 110 Freeway and Central Avenue. The ECC gang began in the late 1970s and was comprised of smaller groups known as "sets." The ECC gang's sets controlled territories throughout the city and tended to operate within those areas on a day-today basis.
>
> The ECC gang regularly engaged in a variety of violent crimes including assaults, robberies, firearms violations, narcotics distribution and sales (most commonly powder cocaine, crack cocaine, and marijuana), witness intimidation, extortion, murder, and home invasion robberies. ECC also maintained a presence within jails and prisons within California.

---

[1] As the Court is particularly familiar with the facts of defendant's case, the government only briefly summarizes the facts here.

During a period ending on July 16, 2020, Wallace, who had been a senior leader of the ECC for approximately 30 years and who was the most influential member of the 6Pacc set of the ECC, committed murder and attempted to commit murder in order to enhance the violent reputation of the ECC gang, to enhance his status within the gang, to retaliate against rival gang members, and to enforce discipline within the gang.

Specifically, Wallace agreed with other coconspirators to commit the following acts:

a) On September 25, 2011, Wallace possessed .22 grams of cocaine; and, on February 5, 2016, Wallace possessed 621 gross grams of marijuana and Ecstasy.

b) On November 13, 2014, Wallace drove a coconspirator to victim R.B.'s residence, within rival gang territory, and provided the coconspirator with a rifle which the coconspirator used to murder R.B. The rifle possessed and discharged in the murder of R.B. was a 7.62 caliber, Norinco AKM-47S assault rifle.

c) On February 10, 2016, and February 12, 2016, Wallace discussed the extortion of a marijuana dispensary within ECC territory and his payment of the proceeds. These conversations took place while Wallace was housed in MDC Los Angeles awaiting sentencing in Docket No.: 16-00083.

d) On April 18, 2018, a co-conspirator stole "protective order" documents to prove to Wallace that a senior member of ECC was cooperating with law enforcement

4

    against the coconspirator in order for Wallace to approve an assault against the senior member of the ECC. On the same date, Wallace discussed with the coconspirator the plan for an assault on the senior member of ECC. (PSR ¶¶ 1-9.)

### III. PRESENTENCE INVESTIGATION REPORT

#### A. Probation's Guidelines Calculation

Probation concluded that defendant has a total offense level of 43. PSR, ¶ 31. This calculation is based on the following:

| | |
|---|---|
| Base offense (U.S.S.G. § 2E1.1) | 43 |
| Murder (U.S.S.G. § 2A1.1)) | 43 |
| <u>Total Offense Level</u> | <u>43</u> |

#### B. Criminal History Calculation

Probation concluded that defendant has 20 criminal history points, resulting in Criminal History Category VI. PSR, ¶ 41. The government agrees with this calculation.

#### C. Resulting Guidelines Range

With a total offense of 43 and Criminal History Category of VI, the resulting Guidelines' range is life imprisonment.

Based on the § 924(c) conviction, defendant is subject to a mandatory sentence of 10 years' imprisonment (120 months), which must run consecutive the Guidelines. On June 10, 2022, the United States Probation Office issued its Recommendation Letter and recommended a sentence of life imprisonment plus 120 months. (Dkt. 322.)

The government agrees with these calculations and Probation's recommendation.

5

**IV. Analysis of § 3553(a) Factors**

    **A.    Legal Framework**

"All sentencing proceedings are to begin by determining the applicable Guidelines range," which serves as "the starting point and the initial benchmark" for determining a reasonable sentence. United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotation marks and citation omitted). The parties should then be given an opportunity to argue for what they believe is an appropriate sentence. Id. Following argument by the parties, the Court must consider each of the sentencing factors listed in 18 U.S.C. § 3553(a), including the applicable Guidelines range, "to decide if [those factors] support the sentence suggested by the parties." Id.; see also Gall v. United States, 552 U.S. 38, 49 (2007). In the end, the Court must impose a sentence that is "sufficient, but not greater than necessary," to reflect the offense's seriousness, to promote respect for the law, and to provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. See 18 U.S.C. § 3353(a); Carty, 520 F.3d at 991.

    **B.    The § 3553(a) Factors**

The significance of a life sentence cannot be overstated. The government makes such a recommendation fully understanding its seriousness. However, here, such a sentence is appropriate for the conduct for which defendant was convicted and is necessary to ensure the safety of the community. Defendant's appetite for violence is beyond dispute. His willingness to extort, intimidate, assault, and

1 murder others for his own benefit is well documented and was proven
2 at trial.
3   If anything, defendant's Criminal History Category of VI
4 understates his dangerousness.  Defendant's criminal record begins in
5 1984, when defendant was 18. (PSR, ¶ 37.)  His first firearms
6 conviction was in 1985, when he was 19.  (PSR, ¶ 38.)  A year later,
7 when in custody for that offense, he was arrested for possession of a
8 weapon in jail.  (PSR, ¶ 39.)  In 1989, defendant was convicted of
9 voluntary manslaughter for his role in a drive by shooting.  (PSR,
10 40.)  Again, in 1989, he was convicted for possessing a weapon in
11 prison.  (PSR, ¶ 41.)  In 1996, while still in custody for voluntary
12 manslaughter, he was convicted again for a weapons violation, this
13 time for possessing a 5 ¼ inch serrated metal weapon in prison.
14 (PSR, ¶ 43.)  None of those offenses even score for criminal history
15 category calculation purposes.
16   Defendant was released in 1999 and immediately continued
17 violating the law.  In 2000, he was convicted for receiving stolen
18 property (PSR, ¶ 43), resulting in another 32 months' prison
19 sentence.  In 2006, he was convicted of felon in possession of a
20 firearm.  (PSR, ¶ 44.)  In 2009, he was convicted for illegally
21 possessing ammunition.  (PSR, ¶ 45.)  In 2011, he was convicted for
22 possessing cocaine.  (PSR, ¶ 46.)  In 2016, he was convicted in
23 federal court for felon in possession of firearms and ammunition.
24 (PSR, ¶ 47.)  Defendant also has numerous other arrests.  (PSR,
25 ¶¶ 52-62.)
26   In looking at this record, it is clear that defendant has been
27 presented with numerous opportunities to change the course of his
28

life away from violence and destruction, and repeatedly he has refused.

Of course, the Court is more familiar with defendant's intransigence than most. The Court heard about defendant's extortionate rent collection from a local marijuana business. The Court also heard about defendant's repeated weapons possession. Following his federal arrest and indictment for felon in possession (see 16-83-AB), defendant spent his time at the Metropolitan Detention Center exercising his control over gang members, continuing his extortion, and engaging in witness intimidation – all to maintain and increase his power within the ECC. After his arrest in the instant case, defendant returned to the Metropolitan Detention Center and his position of power within the jail. And when a fellow inmate questioned defendant's authority, he ordered that inmate stabbed – all while in pretrial detention for a RICO conspiracy/murder case.

Simply, defendant has no regard for the rule of law or the rules of this Court. There is no reason to expect that defendant has or will ever change.

Defendant's penchant for violence is insatiable. Despite his age, defendant does not appear to have slowed down or waned in any way. His ability to control others and order violence is a serious concern. At trial, the jury heard a variety of testimony regarding the importance and value of reputation within the ECC and how younger gangster would routinely seek out defendant's approval in order to improve their own status within the gang. As with the murder of Reginald Brown, defendant has proven his willingness to use these younger, impressionable gang members to engage in acts of violence on

his behalf.  Defendant is as manipulative as he is violent.  Indeed, defendant's own statements regarding his acts of violence – during YouTube interviews and during his jail calls – became some of the best evidence against him.

The Court undoubtedly recalls defendant's recounting of his background in the gang on his YouTube interviews with no sense of remorse.  In one interview with a smile on his face, defendant discusses shooting a dog in an alley and cutting his feet off.  (See Series 2, Part 5, at 5:50 ("I got this dog one time, they said get the dog's feet . . . so I shot the dog in the alley and cut his feet off with the little axe thing I had."))  Elsewhere in those YouTube interviews, defendant discusses his prior acts of murder and mutual respect for other gang members who engaged in similar acts, saying "he was killing like a motherfucker like me . . . and I'm like damn, they putting in work, they got murders under their belt like a motherfucker, I got murders under my."

Defendant's crimes terrorized the victims and businesses of South Los Angeles, and these crimes have a lasting impact of emotional trauma on the victims.  Indeed, the jury heard directly from Janine Webster, the wife of defendant's murder victim Reginald Brown.  Ms. Webster testified to the extraordinary impact that defendant's murder of Brown has had on her life and the lives of their children.  She testified to the emotional trauma, the anxiety, and the fear she and her family live with every day.

The severe punishment requested serves the purposes of general deterrence.  The sentence makes clear that violent gang crime, including murder, cannot be tolerated and that those who use firearms

1  to murder will face harsh punishment.  Defendant's crimes in this
2  case were extremely serious and an extremely serious punishment is
3  warranted.  It is revealing of defendant's lack of respect for the
4  law that defendant engaged in the RICO conspiracy in this case while
5  already subject to a term of probation.  PSR, ¶ 50.
6       The request sentence serves the goal of public safety.  It
7  ensures that defendant will be kept away from the public, so that he
8  cannot continue to terrorize innocent civilians and corrupt young
9  children by turning them into gang members.
10      The government respectfully disputes any claim defendant may
11 make about being reformed or trying to help youth.  (See
12 Recommendation Letter, p. 6.)  The government will respond more fully
13 to such arguments, if defendant makes such assertions in his
14 sentencing memo.  However, the government does note that he has made
15 such self-serving claims in the past, including the last time
16 defendant was sentenced by this Court.  While making such statements
17 to the Court, he was telling friends on jail calls that he was
18 willing to stab anyone who disrespect him in jail or shoot them on
19 the streets.  See Trial Exh. 137 ("Any nigga get at me like that up
20 in here or out there, nigga.  I'm gonna burn with a knife up in here
21 and I'm gonna burn him with bullets out there . . . That's the
22 real.").  Claims that defendant has been reformed or is any way a
23 force for positive changee are no more than the claims of a highly
24 manipulative defendant who understands how to work the system.  Along
25 with his own statements when he thought no one was listening, any
26 claims of reform are also flatly contradicted by defendant's
27 participation in a prison stabbing in 2021, while awaiting trial in
28

this case.  As the Court recalls this was stabbing was over a disrespect issue when another inmate refused to agree to defendant's choice of TV channel.  At a time when he was facing a potential life sentence, defendant continued to engage in acts of violence.

As Probation summarized, the requested sentence, a life sentence, "adequately punishes [defendant] for his conduct, reflects the seriousness of the offense, and promotes respect for the law." (Recommendation Letter, p. 6.)

**V.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court sentence defendant to life in prison as to Count 1, to run consecutive to a term of 120 months imprisonment as to Count 2. In addition, the government respectfully request the Court order defendant to serve five years of supervised release, a fine of $250,000, and a mandatory special assessment of $200.