# EXHIBIT A

1              UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                WESTERN DIVISION

4    THE HON. JUDGE ANDRE BIROTTE JR., JUDGE PRESIDING

5

6 UNITED STATES OF AMERICA,       )
                              )

7              Plaintiff,    )
                              )

8       vs.              ) NO. CR-16-00083-AB
                              )

9 PAUL GARY WALLACE,           )
                              )

10             Defendant.    )
  _____)

11

12

13

14       REPORTER'S TRANSCRIPT OF PROCEEDINGS

15          Los Angeles, California

16          Friday, April 27, 2018

17

18

19

20

21

22      Lisa M. Gonzalez, CSR 5920, CCRR
           Official Reporter
23    United States District Courthouse
      350 W. First Street, Room 4455
24     Los Angeles, California  90012
   213.894-2979; www.lisamariecsr.com
25

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:   OFFICE OF THE UNITED STATES ATTORNEY
                           BY:  VERONICA M. A. ALEGRIA
 3                         ASSISTANT UNITED STATES ATTORNEY
                           United States Courthouse
 4                         312 N. Spring Street
                           Los Angeles, California 90012
 5                         (213) 894-3493

 6   FOR THE DEFENDANT:    LAW OFFICE OF YOLANDA BARRERA
                           BY:  YOLANDA BARRERA
 7                         421 East Huntington Drive
                           Monrovia, CA 91016
 8                         626-574-1053

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          Los Angeles, California, Friday, April 27, 2018;

2                              3:06 p.m.

3                              -o0o-

4          THE CLERK:  Calling criminal case, 16-00083,

5     United States of America versus Paul Gary Wallace.

6          Counsel, please step forward and state your

7     appearances.

8          MS. ALEGRIA:  Good afternoon, Your Honor.

9     Veronica Alegria on behalf of the United States; and with me

10    at counsel table is Special Agent from the FBI, and he's

11    going to hand up binders for the sentencing hearing.

12         MS. BARRERA:  Good afternoon.  Yolanda Barrera

13    appearing for Paul Gary Wallace, who will probably be out in

14    a few minutes.

15         THE COURT:  Is anyone here from Probation or

16    Pretrial?

17         No.

18         All right.  So I see Mr. Wallace is here.

19         Good afternoon, Mr. Wallace.  How are you doing

20    today?

21         THE DEFENDANT:  Fine.  How are you doing, sir?

22         THE COURT:  And I think and hope for everyone

23    involved that this is the last time I'm going to see you,

24    and we'll get to that in a moment.  We're here for

25    sentencing.

1          I have read and considered the presentence report,

2   the revised presentence report, the Government's objections

3   to the presentence report, the Government's -- and their

4   sentencing position, as well as Mr. Wallace's position and

5   Mr. Wallace's response to the Government's position.

6          Ms. Barrera, have you had enough time to read over

7   the presentence report and review it with Mr. Wallace?

8          MS. BARRERA:  Yes, Your Honor.

9          THE COURT:  Do you have any concerns about

10  Mr. Wallace's ability to understand the report?

11         MS. BARRERA:  No, Your Honor.

12         THE COURT:  Mr. Wallace, did you get the

13  presentence report?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  Did you read it?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Do you need any more time to read it?

18         THE DEFENDANT:  No, sir.

19         THE COURT:  And did your attorney and you go over

20  the report?

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  And do you think you understood the

23  report?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  All right.  So, Ms. Barrera, do --

1   let's start with you.  Do you want to contest or change

2   anything in the presentence report, other than what's been

3   submitted in writing?

4           MS. BARRERA:  No, Your Honor.

5           THE COURT:  At this time, do you want to talk --

6   anything you want to present in mitigation as it relates to

7   the appropriate sentence in this case?

8           MS. BARRERA:  Your Honor, I am prepared to argue

9   the various factors.

10           As I indicated in my presentence -- I'm sorry, the

11   position regarding sentencing factors, I believe that a

12   sentence of 27 months as recommended by the probation

13   officer is appropriate in this case.

14           I do not agree with the Government that the rifle

15   that was found seven months -- that was located by law

16   enforcement seven months previous is relevant conduct in

17   this case for all of the reasons that I articulated in the

18   response that I filed.

19           I believe that the cases that the Government cited

20   to are all distinguishable.  They do not -- the Government's

21   arguments do not meet the test that has been set forth not

22   only in the Ninth Circuit but other circuits such as the

23   Seventh Circuit, Sixth Circuit, other circuits as well.

24   That is the test that is set forth in terms of the

25   similarity, regularity, the temporal distance in terms of

1    the possession of the firearms.  I argued all of that in my
2    response.  I am prior -- prepared to argue that, in addition
3    to the written arguments.

4           I also would like to highlight that, as I pointed
5    out in the position paper regarding sentencing factors, this
6    is a highly unusual case because many individuals will stand
7    here before the Court when they are caught and they will
8    say, "I'm very sorry for what I did, and I intend to be a
9    good person from now on.  I intend to follow the law, and I
10   intend to do good deeds in the community."  Everyone is
11   likely to say that under the circumstances of appearing
12   before a judge, but what we have here in Mr. Wallace is
13   someone who had actually been doing that before he was
14   arrested in this case.

15          He has gotten to the point where he is tired of
16   the gang life.  It has brought him nothing but pain and
17   suffering.  His leg is deformed as a result.  He is lucky to
18   be alive.  He is lucky to be walking.  He suffered quite a
19   bit as a result of that, and he understands it was all him.
20   He was not a victim, and he had no business being involved
21   in the illegal activities that he was involved in as a youth
22   and even later.

23          But fortunately for him and for the community, he
24   did get to the point where he was done with that; and that
25   is what he was telling the agents when they spoke to him

1    after his arrest in February.  It wasn't just him saying

2    that.

3            When I met Mr. Wallace -- as Your Honor knows, I

4    was not the first attorney.  I came into the case after he

5    had already pled guilty, and he advised me that he had done

6    all these good things in the community, and I have to admit:

7    Okay.  Sure, you did these things, because I heard that

8    before.

9            THE COURT:  Right.

10            MS. BARRERA:  But it turned out that he was not

11    lying.  He was very involved in community work, and it was

12    verified not just by his family.  Several members of his

13    family are here.  It wasn't just verified by them, it was

14    verified by two reverends, Coach Ward.  Coach Ward is

15    working with --

16            THE COURT:  But he's a gang interventionist

17    basically.

18            MS. BARRERA:  It's gang intervention.  He was

19    working gang intervention and working with at-risk youth,

20    and he reached out to my client, to Mr. Wallace, to assist

21    with that.  And it was right up his alley.  That is exactly

22    what he wanted to do.

23            He was trying to work with the police to do that.

24    He was trying to work with different community centers.  He

25    was trying to do one on one on his own.

1          And he saw this opportunity to be able to do more

2     than just take care of his children and his family and help

3     neighbors, he saw an opportunity to be of benefit to turn

4     his negative life into something positive, which is what he

5     decided to do.

6          And for the last -- he's been in custody two

7     years -- for the four years previous to being in custody on

8     this case, that's exactly what he was doing.  He was working

9     with individuals who were interested in stopping the

10    violence, stopping the young kids, going into the gangs.

11         So he wasn't just -- he's not just talking about

12    doing it in the future or talking about I've had a

13    revelation, this is the kind of person I'm going to be.

14    Mr. Wallace did it, and he was doing it.  And it is his

15    intention to continue to do it once he is released from

16    custody.

17         He is very interested in writing a book.  He is

18    very interested in continuing to work with young kids to

19    tell them, "Look at me.  This is what happens to you when

20    you go into the gang.  You end up with prison all of your

21    life.  You end up with seven bullets in your body.  You end

22    up with a limp."  This is a -- and stopping the young kids

23    from going in that direction.

24         And I think that the Government's argument in

25    terms of an upward departure and the high end are misplaced

1  given who Mr. Wallace is.  Those may be arguments for

2  someone else who is involved in the gang life, but those are

3  not good arguments for someone like Mr. Wallace.

4        I am prepared if the Court wishes to address the

5  issues of similarity, regularity, the temporal issues, if

6  the Court wishes for me to address those further.

7        THE COURT:  I don't at this time.  I'll let the

8  Government make its pitch, and then I'll respond.  The one

9  area that for me is specific to Mr. Wallace, but also sort

10 of, perhaps, a societal issue as well, the reality of it is,

11 Mr. Wallace, he's been clean, at least not charged with any

12 crime from 2012 until when he got arrested -- was it 2015 or

13 2016?

14        MS. BARRERA:  2016.

15        THE COURT:  So for four years.  You're not fooling

16 anybody.  Look, he's got guns in his home.  And I suspect

17 because part of the reason he's not taking a job at

18 McDonald's.  He's not going to work at Home Depot.  But I'm

19 talking to you today, Mr. Wallace.

20        So what happens when he goes back to that

21 neighborhood, and he's not going to get a job at McDonald's,

22 or he does participate -- want to work at McDonald's?  He's

23 got kids that he wants to support.  I have a concern that

24 he's about that gang life.  I like to think that's in behind

25 him, but, nonetheless, he's going back to an environment

1  where that has permeated that neighborhood.  What happens
2  then?  But that's the issue or concern that I have with this
3  case.
4          MS. BARRERA:  And I understand that, and that is
5  something that I personally was also concerned about when I
6  spoke to Mr. Wallace because at some point, regardless of
7  what sentence is imposed today, he will end up with
8  supervised release; he will end up with a condition where
9  law enforcement can search his home, can search his person.
10         THE COURT:  Basically any time.
11         MS. BARRERA:  At any time.  And so my concern also
12  was the same as the Court's:  What's going to happen then?
13  Your Honor is correct that he possessed those firearms not
14  to be assaulting individuals, but he felt the need to be
15  able to have them with him to be able to display them at the
16  marijuana dispensary if he needed to do that.
17         And apparently he needed to do that on one
18  occasion.  The marijuana dispensary's located in a bad part
19  of town and individuals from several gangs go in there and
20  start threatening to assault individuals, to burn things
21  down, and he felt that he needed that security to be able to
22  pull out the gun and say, "You're not going to do any of
23  that.  You're going to get out of here, and you're going to
24  allow this business to stay here."
25         He understands that he can't do that.  He can't do

9

1   that when he gets released from the custody regardless of

2   what sentence he gets, and he's just going to have to try

3   harder to get some other kind of job.  He is committed to

4   that.  He is committed because of his children.  His

5   children are very young.

6          THE COURT:  Two out of the three or all three?

7          MS. BARRERA:  Two out of the three.  Because he

8   was found by the courts to be the better parent.  And, I

9   mean, the family is taking care of the children, but there

10  was no substitute for a father.  He adores his children, and

11  they adore him.  They want him in the community.  He is

12  committed that his children will have a better life; that

13  his children will have a better life than he ever had.  And

14  he is committed to not violating the law.

15         He's going to have to contact his contacts,

16  Coach Ward, for example, the various reverends.  He also

17  worked with Pete Carroll.  We didn't have sufficient time to

18  get a letter from him, but all these individuals have

19  encouraged him not only to get involved in community work,

20  but they've encouraged him to write a book.

21         They've encouraged him to do other activities at

22  community centers, and I think that is the direction too

23  he's going to have to go in in terms of getting a job at a

24  place like that where he can do community work and get some

25  money for it.  Because working as a security guard isn't

1   going to work, working at McDonald's isn't going to work for

2   him.

3          But he has a gift.  He has the gift of being able

4   to reach people, and I think it's a combination of a gift

5   that he has, as well as a product of all of these

6   experiences and him coming to a certain realization.  And he

7   believes that he can use that to not only do something

8   positive, something good in the community, but be able to

9   get some kind of job.

10          And I think it is possible.  He's going to need

11   some help maybe from the probation officer to be able to

12   find -- make -- apply for grants, maybe contact these

13   various individuals who know him who can give him a job.

14          And, actually, Mr. Wallace confided in me that

15   Pete Carroll had offered to pay him for speaking to various

16   groups, at-risk groups.  He did not want to accept the money

17   because he felt that wasn't why he was doing it.  He was

18   doing it because he was doing it with his heart.  This was

19   his way of giving to the community, giving back.  But I

20   think he's going to have to change his mind about that, and

21   I think he is going to have to accept money from various

22   organizations when he goes in to speak to him because I

23   think that is the way he can get the money he needs and not

24   have to carry guns.

25          THE COURT:  All right.  Thank you, Ms. Barrera.  I

1   appreciate that.

2          All right.  Mr. Wallace, do you have anything that

3   you want to say at this time?  We go way back.  When your

4   lawyer said two years, it didn't dawn on me, but it has

5   indeed been two years of back and forth.

6          So this is the time if you want to talk to me.  If

7   Ms. Barrera can bring the microphone closer to you, that's

8   fine.

9          THE DEFENDANT:  I just think about, you know, not

10  going back to the community.  That's an option.

11         THE COURT:  Well, let me -- I'm going to push hard

12  on you today.  You say you're not going to go back to the

13  community.  The presentence -- thankfully your mom has got

14  your side, you're more than welcome to come back and live

15  with her.  That's in the community, isn't it?

16         THE DEFENDANT:  No, she lives in Compton.

17         THE COURT:  All right.  Go ahead, then.

18         Thank you.

19         THE DEFENDANT:  And I just want -- like I was

20  trying to tell the first attorneys, I was trying to do what

21  Ms. Yolanda Barrera did as far as just finding people that I

22  was working with to show that I did do some good out there.

23         I didn't hold nothing back when I came back here.

24  I talked to Henderson.  I talked to the agents about the

25  gang, something I didn't suppose to do as a gang member, and

1  I did that.

2      I talked to them, and I explained to them

3  everything that I was doing, and they told me, "Thank you

4  for talking with us.  And we know you weren't active," but

5  that ties me to the indictment of everything -- to the gang

6  that they accumulated, to the four-year identity, because I

7  wasn't active with them.

8      And I was telling them that I was taught wrong.

9  I've been telling them we've all been taught wrong, and I'm

10 a part of teaching you all wrong, and I don't want to

11 continue teaching you wrong because now I know the right

12 way.

13     And what I did was I started preaching against the

14 gangs, and I started trying to lead the youth down a right

15 path and teaching the youngsters to take care of their kids,

16 mothers turn from drugs, you know, just leave the gang life

17 alone.

18     And I had -- one thing that was over my head that

19 I didn't get over since I've been in here and, like I told

20 the agents, I had the gun because I was scared that I would

21 get killed, but I had turned from the gang.  And since I've

22 been in here the two years -- I don't know if bring up God

23 here, but I know God has changed me and been talking with me

24 and speaking to me.  Like, he was out there, and that's

25 where my change came from.  And God started telling me,

1  convicted me, and I started turning from all the wrong.  I
2  was like, "Oh, my God.  What have I done with my life?"  I
3  just started changing my life.

4        And my mother always told me that one day God has
5  a purpose for you, Paul, because I was good with kids.  He's
6  saving you for a purpose, and that purpose came to life in
7  2011.  I came home, and I just started -- I went against
8  everything the gang stood for.  And the gang is more like --
9  right now, they're mocking me:  You went against everything.
10 You turned on us.  And they got you in there now.

11       And that's not going to stop me from continuing
12 the path I was on because I know it's wrong.  My eyes is
13 open now, and I'm ready to respect the law.  I'm ready to
14 not have weapons.  I learned my lesson.  I just need a
15 chance because the chance is there for me.  I have
16 everything, like, I need, like Ms. Yolanda Barrera said, to
17 work and get paid for it in changing the youths' lives.
18 I've been a factor in doing that, and every peace
19 organization I worked with, they gave me an award for it.
20 And I found my life really, like, this is what I need to be
21 doing.  This is what I should have been doing in life, and I
22 never even gave it a try to do something like I was doing
23 because all I knew was the gang life.

24       And when I turned from it, I started the -- seeing
25 what I was doing.  I started realizing that this is what I

1    need to be doing.  I'm 52 years old.  I need to turn my life

2    around.  And still even in here, I've been to Bible study.

3    I go to church.  And the reverends, Antioch, they want me to

4    visit them in Long Beach, speak with the youth, because they

5    see it in me too.

6            And I really never imagined this would happen to

7    me because when you're a youth, I know how the gangs will

8    force you.

9            And my mother raised me good.  My mother raised

10   with Christianity.  She raised me in the church.  And when

11   you have a youth going out trying to hang with some gangs so

12   he can fit in and just be around everybody, that's me.  And

13   my mother always told me that's not the life.

14           And I ended up getting shot in 1982.  I got again

15   in 1984 and 1985, and it made me bitter.  It just made me

16   bitter, and it made me the -- what my mother told me about

17   God.  It was, like, why would God do this to me?  I'm not

18   the bad one in the gang.  This guy should have gotten

19   killed.  It made me bitter in the gang, and I became a

20   full-fledged gang member then.

21           And now I woke up in 2011.  I said, "I got to turn

22   from this lifestyle.  This is not me.  This is not who my

23   mother raised me to be."

24           Sister Carla, she told me she wanted me to speak

25   in the church, and we've been going to the church since

15

1  1973, and that's Mr. Wallace, and that's the bad one.  And I

2  end up speaking in the church, and I got a standing ovation

3  in the church.

4        THE COURT:  That's what's referred to in the

5  letter, right?

6        THE DEFENDANT:  Yes, and that inspired me because

7  I was shocked that everybody stood up to clap after what I

8  said.  I felt like even in here, just sit around, and we

9  have Bible study.  We got a Bible study we started in the

10 building.  And I talked to, you know, the guys in there, and

11 I just tell them all I've been through.  And it just -- it's

12 just when you look at how I'm not worthy of God to be giving

13 me an opportunity, a chance, I'm not worthy, and that's how

14 I felt.

15        And when I was talking to the youth, I didn't

16 receive the money because I felt I wasn't even worthy to get

17 the money.  And they was trying to pay me for talking to the

18 kids, and I demented (sic) them.  I don't need the money.

19 Because of the wrong I did in life, I felt like I need to

20 give back without money.

21        And it kills me every day to think about all I've

22 been through.  At this age now -- you get 52, you get older,

23 and your soul gets tired.  I'm done.  I'm tired.  And I just

24 want to do what's right and get back to life.  That's all I

25 really want to do.  I just want to save some children's

1   lives because I know I can.  And that's all I really wanted

2   to do.

3          And the two guns I got caught in my house I was

4   using them out of fear, but in here God told me, "You don't

5   have to fear nobody.  You're doing my work.  Death is

6   inevitable."  So I don't have no problem with respecting the

7   law when I get out.  I don't.

8          And I respected the law when they talked to me,

9   and I came in here by talking with the law.  I let it all

10  go.  I don't have no problem going to the gangs, associating

11  with nobody from the gangs.  I just have positive people

12  waiting on me to get out, and I want to do the work that

13  they have waiting for me.

14         But I just need a chance, and I'm asking the Court

15  to give me a chance to change my life and change somebody

16  else lives.

17         THE COURT:  All right.  Mr. Wallace, thank you.

18  Thank you.

19         All right.  Ms. Alegria, apparently you have a lot

20  to talk to me about.

21         MS. ALEGRIA:  Thank you, Your Honor.

22         THE COURT:  I'll start with the questions of which

23  I know the answers.  Do you want to contest or change

24  anything in the presentence report, other than what's been

25  submitted in writing?

1       MS. ALEGRIA:  Nothing other than what's already

2  been submitted in writing.

3       THE COURT:  So I reluctantly ask this question,

4  but I will:  Do you have anything you want to present on

5  behalf of the Government at this time?

6       MS. ALEGRIA:  Yes, Your Honor.  The Government

7  would like to briefly respond to defense counsel's second --

8  to what they said today in their second submission, and then

9  the Government would like to present evidence on the assault

10  rifle.

11       THE COURT:  All right.

12       MS. ALEGRIA:  Your Honor, first, defendant's

13  self-serving statements that he has been done with gang life

14  for the last four years between when he was last released

15  from his sentence for possession of cocaine and when he was

16  arrested on this charge are simply not supported by the

17  evidence.

18       Your Honor, there were seven contacts with police

19  between 2012 and this 2016 offense.  Six of them involve his

20  association with East Coast Crips gang members.

21       In December 2012, he was hanging with four other

22  East Coast Crips gang members.  In February of 2013, he

23  was -- admitted associating with.

24       In June of 2009, there was a traffic stop.  In

25  July of 2013 in which he was with other members of the East

1  Coast Crips gang.

2       In April of 2015, he was contacted by police

3  because of narcotics' activity with other East Coast Crips

4  gang members.

5       And, of course, in July of 2015, it was his

6  assault rifle in the van that he rented that he received

7  from another member of the East Coast Crips gang.

8       And then in December of 2015, he was at a traffic

9  stop in front of that same address where the rifle was found

10  with other East Coast Crips gang members where he had other

11  controlled substances.

12       Additionally, in addition to the seven police

13  contacts, three informants, as outlined in the affidavit for

14  the search warrant, separately told the investigators in

15  this case who were investigating RICO activity for East

16  Coast gang that he was a leader for the East Coast gang and

17  also talked about his involvement with narcotics

18  trafficking.

19       THE COURT:  And I'm curious, should we be

20  anticipating some evidence along that line?

21       MS. ALEGRIA:  No, Your Honor.  So it is just

22  simply not the case that he has, in these four years,

23  completely come clean.  He has clearly been involved and

24  deeply involved in gang life and in controlled substances,

25  in narcotics, as narcotics were found in his home on the day

1 that it was searched.

2          Second, Your Honor, regarding the Government's

3 argument for upward departure in criminal history category,

4 defense argued that Government's argument is based on a

5 disagreement with the guidelines in terms of something being

6 too old and that not counting.  That is not really what the

7 Government is arguing here.

8          The Government is arguing that based on Sentencing

9 Guideline 4a1.3, there are two ways which you can have an

10 upward for criminal history category and both of those are

11 supported here.

12          First, the seriousness of the criminal history

13 category is underrepresented.

14          THE COURT:  He's currently --

15          MS. ALEGRIA:  He's currently Criminal History

16 Category V, and the Government is arguing for --

17          THE COURT:  You don't think V is serious enough?

18          MS. ALEGRIA:  To VI.

19          THE COURT:  I get that.

20          MS. ALEGRIA:  It is, but it still underrepresents

21 both the seriousness of his criminal history and his

22 likelihood of recidivism, Your Honor.  This is now a

23 ten-time convicted felon.  Five of those felonies don't even

24 counts toward his criminal history category.  If they did,

25 his category number would be twice what would be

1  represented.

2         The reason why his criminal history number is not

3  larger is because he has been convicted of such serious

4  offenses.  He spent 24 years in prison, and it's only

5  because of that time in prison that he hasn't committed more

6  crimes.

7         As his pattern amply demonstrates, as soon as he

8  is released from prison, he goes on to immediately engage in

9  criminal activity, sometimes even before he's done with his

10 sentence of parole.  And sometimes he's committed these

11 crimes while being in prison.

12        So, Your Honor, the pattern of repeated criminal

13 behavior shows a clear -- how serious this is and the

14 likelihood of recidivism in this case which is understated

15 by Criminal History Category V.

16        Your Honor, the main differences between the

17 revised PSR and the original PSR --

18        THE COURT:  Is about five years in prison.

19        MS. ALEGRIA:  Yes, Your Honor.  It's about a

20 criminal history -- sorry, an offense level of 12 versus 20,

21 and it's based on whether or not the -- assault rifle was

22 relevant conduct or not.  The defendant was not indicted.

23 He did not plead guilty to this.

24        THE COURT:  I want to make sure.  You said he was

25 not indicted?

1    MS. ALEGRIA:  Correct.  He was not indicted for

2 this third firearm.  He did not plead guilty to this third

3 firearm, so because of the vast differences, the Government

4 has to prove this by clear and convincing evidence, which

5 the Government is prepared to do now.

6    With Your Honor's permission, I would ask Special

7 Agent Henderson to take the witness stand.

8    THE COURT:  So in the words of Hamilton, we're

9 really going to do this?

10    MS. ALEGRIA:  Yes, Your Honor.

11

12                    PRENTIS L. HENDERSON,

13 CALLED BY THE GOVERNMENT, WAS DULY SWORN AND TESTIFIED AS

14                        FOLLOWS:

15

16    THE CLERK:  Please state and spell your name for

17 the record.

18    THE WITNESS:  My name is Prentis Louis Henderson,

19 H-e-n-d-e-r-s-o-n.

20    THE COURT:  All right.  You may proceed.

21

22                    DIRECT EXAMINATION

23 BY MS. ALEGRIA:

24 Q    Thank you, Special Agent Henderson.

25    Where do you work?

1    A    The FBI, Los Angeles Division.

2    Q    And what is your title?

3    A    Special Agent.

4    Q    And how long have you been working as a special agent

5    for the FBI?

6    A    Going on three years.

7    Q    And what did you do before that?

8    A    I was a police officer in the state of Georgia for

9    eight years prior.

10   Q    And what kinds of training have you received?

11   A    I had 21 weeks special agent training in Quantico,

12   Virginia, with the FBI; and prior to that with -- I had

13   about six months of Georgia POST.

14   Q    Don't speak so fast, otherwise, the court reporter will

15   yell at you.  Thank you.

16        Are you familiar with the facts and evidence of

17   this case?

18   A    Yes.

19   Q    How?

20   A    I was introduced to this case December 2015, in

21   reference to investigating the East Coast Crips.

22   Q    And what is your role in this case?

23   A    Special agent.  I'm the case agent.

24   Q    And are you familiar with an incident on July 25th,

25   2015?

23

```
1    A    Yes.

2    Q    How?

3    A    July 2015, LAPD Newton, responded to a disturbance.

4    While a disturbance was taking place, others came across --

5              THE COURT:  Slow down, sir.

6              THE WITNESS:  A gray Toyota Sienna van.  While

7    looking in that van, they saw an AK-47 in plain view.

8    BY MS. ALEGRIA:

9    Q    And how are you familiar with all of these facts?

10   A    Speaking with the investigating officers.

11   Q    Did you also review a police report?

12   A    Yes.

13   Q    I'm going to show Exhibit 4.

14             Is this a police report you reviewed?

15   A    Yes.

16   Q    And when they were canvassing the area, what did they

17   see in the van?

18   A    AK-47 style assault rifle.

19   Q    And was this AK-47 in plain view?

20   A    Yes.

21   Q    And what else was in the van beside the assault rifle?

22   A    A rental car agreement from Ritz Rental Car.

23   Q    I'll get to that in a second, but was the assault rifle

24   loaded?

25   A    So there was an assault rifle, along with a 30-capacity
```

24

```
 1  magazine, and I believe 13 to 12 live rounds of ammunition.
 2  Q    Did you run a trace through the ATF database on this
 3  assault rifle?
 4  A    Yes.
 5  Q    Where was this assault rifle manufactured?
 6  A    China.
 7  Q    And you said you also found a rental agreement in the
 8  van?
 9  A    Yes.
10  Q    I'm now showing you Exhibit 6.
11          Is this the rental agreement?
12  A    Yes, ma'am.
13  Q    And according to the rental agreement, who rented the
14  van?
15  A    Paul Gary Wallace.
16  Q    And what's the address he listed?
17  A    6504 South Broadway, 90003, Los Angeles, California.
18  Q    And are you familiar with that address?
19  A    Yes.
20  Q    How?
21  A    That's the address we served the search warrant on
22  February 5th, 2016.
23  Q    And I'm now showing you -- sorry.  Sorry.  And the
24  birth date and driver's license numbers, can you read those?
25  A    Date of birth, January 14th, 1966; and driver's license
```

```
1   number D6445021

2   Q     And I'm now showing you Exhibit 7.

3          What is this exhibit?

4   A     This is California Department of Motor Vehicle inquiry.

5   Q     And do the driver's license, date of birth and address

6   all match what was written on the rental agreement?

7   A     Yes.

8   Q     I'm now going to show you page two of the rental

9   agreement.  If and what was on page two of the rental

10  agreement?

11  A     A copy of the Mastercard that was used to rent the

12  vehicle.

13  Q     And what is the name on the Mastercard?

14  A     Paul G. Wallace.

15  Q     And what does the signature say on the Mastercard?

16  A     Paul Gary Wallace.

17  Q     And on page three of the rental agreement -- what was

18  on page three?

19  A     A California Identification Card for Mr. Wallace.

20  Q     And what is the name and address on this?

21  A     Gary Wallace.  Address, 425 South Oleander Avenue,

22  Apartment 413, Compton, California 90220.

23  Q     And had you ever seen this identification card before?

24  A     Yes.

25  Q     Where?
```

```
 1   A     During the search of Mr. Wallace's house on
 2   February 5th, 2016, in his wallet.
 3   Q     I'm now showing you Exhibit 2, page three.
 4         Do you recognize this photograph?
 5   A     Yes.
 6   Q     What is this photograph?
 7   A     It's a photo of the wallet found during the search.
 8   Q     And does this have the same name and the same address
 9   as the copy of the California Identification Card from the
10   rental agreement?
11   A     Yes.
12   Q     Was the van tested for fingerprints?
13   A     Yes.
14   Q     Did any fingerprints match the defendant?
15   A     Yes.
16   Q     I'm now showing you Exhibit 8.
17         What is this exhibit?
18   A     It's a lab report from the Los Angeles Police
19   Department latent print unit.
20   Q     And what was their finding?
21   A     That there were three fingerprints found on the vehicle
22   that belonged to Mr. Wallace.
23   Q     And where were those fingerprints found?
24   A     Outside driver's side sliding door for all three of
25   them.
```

```
1    Q    Sorry.  The last one?

2    A    Sorry.  The rear window on outside driver's side.

3    Q    Was the firearm also tested for fingerprints?

4    A    No.

5    Q    Was the firearm also tested for fingerprints?

6    A    Yes.

7    Q    Were any fingerprints found?

8    A    No.

9    Q    How far -- I'm showing you Exhibit 10.  Can you

10   describe Exhibit 10?

11   A    This shows the location of 6504 South Broadway where

12   Mr. Wallace lived, and also where the incident with the van,

13   220 West 56th Street.

14   Q    Can you circle on this exhibit where the van was found?

15   Can you do it on your -- yeah.  Can you circle on this

16   exhibit where defendant lives?

17   A    (The witness complied.)

18   Q    And that back alley, is that a way to access 65th

19   Street?

20   A    Yes.

21   Q    Can you draw that like how you would go from

22   defendant's backyard to the van?

23   A    (The witness complied.)

24   Q    Do you know anything in particular about this address

25   where the van was found?
```

1  A    LAPD made contact with Mr. Wallace December 2015 where

2  he was in possession of narcotics.

3  Q    And you said that as part of your investigation you

4  searched defendant's home.  And what did you find during

5  that search on February 5th, 2016?

6  A    We found two firearms in the bedroom, along with

7  Mr. Wallace's wallet.

8         And in the living room, three bags of marijuana

9  that -- I believe 621 grams.  There was also pills and

10 Ecstasy found, which I think the Ecstasy weighed about

11 40 grams.

12 Q    And was there any evidence that any other adult lived

13 in that home?

14         THE COURT:  Counsel, forgive me for interrupting,

15 but didn't he plead guilty to this?

16         MS. ALEGRIA:  Yes, yes, Your Honor.  I'm going to

17 ask about -- just establishing --

18         Sorry.  I'll move on.

19         THE COURT:  All right.  Thank you.

20         Folks, let me do my job.  Sit in the audience.

21 Please.  Thank you.

22 BY MS. ALEGRIA:

23 Q    And at the end of that search, what happened?

24 A    Mr. Wallace was interviewed.

25 Q    And did he say anything about the AK-47 that was found

1  in July during that interview on February 5th?

2  A     Yes.

3  Q     What did he say?

4  A     He stated that he was hanging with an East Coast by the

5  name of Tiny Hood or Infant Hood and during that time he was

6  shown an AK-47.  Mr. Wallace stated he felt the AK-47.  And

7  when the AK-47 was given back to Tiny Hood, I believe Tiny

8  Hood saw police around the area and threw it in the van.

9  Q     And was an interview -- was Mr. Wallace interviewed a

10 second time on February 8 of 2016?

11 A     Yes.

12 Q     And was that interview recorded?

13 A     Yes.

14 Q     And during that recorded interview, did defendant

15 Wallace also mention the AK-47?

16 A     Yes.

17         MS. ALEGRIA:  Now playing Exhibit 13.

18         (Audio being played.)

19         MS. ALEGRIA:  No further questions.

20         THE COURT:  All right.  Ms. Barrera.

21

22                   CROSS-EXAMINATION

23 BY MS. BARRERA:

24 Q    With respect to the July 2015, I believe you said there

25 was a disturbance; right?

```
 1  A    Yes, ma'am.

 2  Q    The disturbance was actually a group of about five gang

 3  members who were kicking and beating up another individual

 4  from a rival gang; isn't that correct?

 5  A    Yes.

 6  Q    And those individuals saw the police coming and jumped

 7  in a vehicle and took off at a high rate of speed; isn't

 8  that correct?

 9  A    Yes.

10  Q    And that vehicle stopped in front of Mr. -- or close to

11  the front of Mr. Wallace's home and ran; correct?

12  A    Yes.

13  Q    When they were arrested, that's when the police looked

14  into Mr. Wallace's van and saw the rifle; right?

15  A    Per the report, they were canvassing the area and saw

16  in plain view.

17  Q    But nobody saw anyone throw that firearm into the car

18  that was rented by Mr. Wallace; right?

19  A    Per the reporting, no.

20  Q    And that rifle was not hidden inside the vehicle;

21  correct?

22  A    No.

23  Q    And wouldn't it make sense to you, Agent Henderson,

24  that if somebody was going to possess an illegal weapon and

25  have it in the car that they would hide that rifle instead
```

```
 1  of leaving it in plain view?

 2          MS. ALEGRIA:  Objection.  Calls for speculation.

 3          THE COURT:  Overruled.

 4          THE WITNESS:  I can't put myself in the mind-set

 5  of a person possessing a gun.

 6  BY MS. BARRERA:

 7  Q    Just using your common sense, if you were going to

 8  possess something that you knew was illegal, would you leave

 9  it in plain view where anyone passing by could just look in

10  and see it?

11  A    I'm not sure.

12  Q    Just use your common sense.

13  A    Yea or nay.

14  Q    You're not sure what you would do?

15  A    No, not in that moment.  I can't place myself in the

16  mind-set of that specific activity.

17  Q    It doesn't have to be a firearm.

18          THE COURT:  Miss barrera, let's move on to the

19  next question, please.

20  BY MS. BARRERA:

21  Q    Fine.  The rental vehicle of the van had Mr. Wallace's

22  name; right?

23  A    That's right.

24  Q    Had his correct name?

25  A    Yes.
```

1    Q     And he had correct date of birth; right?

2    A     Yes.

3    Q     And the credit card that he used to rent the van had

4    his correct name; right?

5    A     Yes, ma'am.

6    Q     It was not a stolen credit card; right?

7    A     No.

8    Q     And wouldn't it have made sense to you, using your

9    common sense, that if somebody was going to possess

10   something illegal in a van that they are renting that they

11   would not use their correct name or correct address or

12   correct driver's license number or correct date of birth?

13            MS. ALEGRIA:  Objection.  Calls for speculation.

14            THE COURT:  Overruled.  But I think we need the

15   answer.  So Ms. Barrera, it's up to you.

16            MS. BARRERA:  I'll proceed, Your Honor.

17            THE COURT:  Thank you.

18   BY MS. BARRERA:

19   Q     The rifle that was found in that rental van was tested

20   for prints, was it not?

21   A     Yes, ma'am.

22   Q     And you said there were no fingerprints.

23            Was it no fingerprints, or no fingerprints

24   belonging to Mr. Wallace?

25   A     No fingerprints.

33

```
 1   Q     And Mr. Wallace was not charged with possession of that
 2   firearm; correct?
 3   A     Not to my knowledge.
 4   Q     When you interviewed Mr. Wallace during the search of
 5   his house in February 2016, did you record that first
 6   conversation?
 7   A     There was an attempt to record it by Special Agent
 8   Kane, yes.
 9   Q     But it wasn't recorded?
10   A     No, there was malfunction with the recording device.
11   Q     And in the second -- well, I withdraw that.
12         And at that time, you say he told you that he was
13   talking to another individual who showed him the rifle;
14   right?
15   A     Yes.
16   Q     And that when the police showed up, following these
17   other individuals who had been assaulting someone, that
18   individual, Infant Hood, threw it into the rental van;
19   correct?
20   A     Yes.
21   Q     That's what he told you?
22   A     Yes.
23   Q     And then you interviewed him a second time where there
24   was a recording; right?
25   A     Yes.
```

```
 1   Q      And he told you the same thing, didn't he?

 2   A      Yes.

 3   Q      He said that individuals showed him firearms; right?

 4   A      Yes.

 5   Q      And they're not showing him for him to use or for him

 6   to take, isn't that what he told you?

 7   A      Yes.

 8              MS. BARRERA:  No further questions, Your Honor.

 9              THE COURT:  Ms. Alegria.

10              MS. ALEGRIA:  Thank you, Your Honor.  May the

11   witness be excused?

12              THE COURT:  Yes, absolutely.  I thought you had

13   more questions.

14              MS. ALEGRIA:  No.  No further questions,

15   Your Honor.

16              THE COURT:  Ms. Alegria, anything further you wish

17   to add?

18              MS. ALEGRIA:  A few more points based on the

19   witness' testimony.  There has been established by clear and

20   convincing evidence the fact that defendant did indeed

21   possess this firearm.

22              THE COURT:  Are you suggesting that the fact we're

23   going to use his self-serving statement now against him and

24   say because someone gave him something, he held it, and gave

25   it back, that fits win the definition of this sentencing?
```

1          MS. ALEGRIA:  Your Honor, there are two

2    instances -- both him -- an admitted handling of the

3    firearm.  It was in his custody and control, even if it was

4    owned by someone else in that moment.

5          But, in addition, Your Honor, defendant had

6    knowledge that the assault rifle was placed in the van.  He

7    saw it being placed there, even if he didn't place it, and

8    he had control of the van.  So knowledge, plus control is

9    also possession.

10          So when the firearm was placed in the van, it was

11    in his constructive possession.  He's the controller of that

12    van.  That firearm was there, and he knew it was there.  His

13    fingerprints are on the van.  It's undisputed.

14          THE COURT:  I don't think that's the issue.  It's

15    his van.  The issue is -- all the evidence is by his own

16    admission.  If we assume that's true, somebody put something

17    in his van, and now he's good for it.  I just want to

18    understand that I understand the theory that we're working

19    with here.

20          MS. ALEGRIA:  Yes, Your Honor.  He both held it,

21    and it was in his constructive possession when he held it,

22    and he knew it was there.

23          THE COURT:  Got it.

24          MS. ALEGRIA:  And, Your Honor, I would like to

25    address briefly why this is relevant conduct.  There is

1 regularity, similarity and the time interval is short enough

2 that this can be considered relevant conduct.

3          THE COURT:  Tell me what you mean in the light

4 most favorable to the Government.  If it's just gun, gun,

5 gun, or does it have to be the same type of gun?

6          MS. ALEGRIA:  Well, here, Your Honor, the

7 similarity is the fact that it's the same crime.  It's felon

8 in possession of a firearm, and then felon in possession of

9 a firearm.

10          THE COURT:  Does it matter that one is a rifle

11 versus a pistol?

12          MS. ALEGRIA:  No, Your Honor, the Ninth Circuit

13 cases don't distinguish between types of guns.

14          THE COURT:  When they talk about common scheme or

15 crime, if the crime -- not the specifics of the crime.

16          MS. ALEGRIA:  So, Your Honor, in terms of

17 regularity, you have this pattern of defendant having a gun,

18 continuously possessing a gun for his protection at the

19 marijuana dispensary.  So similarity.  Same crime.

20          Regularity is the pattern and the reason why he's

21 having that gun.  The differences between the different

22 crimes is kind of the distinction that the Ninth Circuit

23 made when one instance there was a charge of possessing a

24 machine gun, which is a different crime than illegally

25 possessing a firearm because you're a felon.

1      But here you have -- and, Your Honor, various

2  other districts, other circuits, have said that this time

3  interval, seven months, is short enough to be considered

4  within the same course of conduct.

5      THE COURT:  But are there other districts that say

6  that it's not?

7      MS. ALEGRIA:  Not to my knowledge.  I didn't see

8  any case where it said it's too long from felon --

9      THE COURT:  You're saying seven months is not too

10 long when the crime is exactly the same?

11     MS. ALEGRIA:  Correct.  Your Honor, correct.  I

12 was focusing my research on felon in possession to felon in

13 possession because all the case law suggests when you have

14 stronger -- when one of the three factors that is such a

15 strong factor, you can have weaker -- other factors.

16     So in other cases where there was felon in

17 possession and felon in possession, I didn't see a case

18 where the case was too short.

19     THE COURT:  Well, the crux of your argument really

20 falls on whether the two crimes are the same; correct?

21     MS. ALEGRIA:  Your Honor, that is for the

22 similarity and my -- I am arguing that seven months is not

23 too long of a time interval.  It is fairly recent.

24     And also you have here a defendant who is engaged

25 in, you know, this activity of him possessing this AK-47 was

```
 1   kind of in support of his associations with the East Coast
 2   Crips.
 3            THE COURT:  Let's just be candid here.  Is that
 4   really fair?  Let's just get right down to it.  Look, I
 5   could be wrong.  I'm just basing it on my prior life.  And
 6   to be clear, you're doing exactly what I would expect the
 7   Government to do, you're doing exactly what I would want
 8   prosecutors who work for me.
 9            But let's be honest, this case was about a RICO
10   case, and the hope was that I would get Mr. Wallace on the
11   RICO based on the two informants.  Now we're left with
12   Mr. Wallace has two guns on him, and he's been charged.  Why
13   do we now -- I'm not sure how I can go with the argument
14   that this possession, which again I think there's some
15   debate about this possession of this AK is part of some
16   ongoing conduct when there's no evidence of the ongoing
17   conduct.  If there was -- I think I'm fairly certain if
18   there was a RICO case to be made, there'd be a RICO case
19   that I'd be dealing with.  Is it really fair to say that
20   this possession of this AK is part of some ongoing conduct?
21            MS. ALEGRIA:  Not to RICO per se, but it, in
22   defendant's own words, in support of his gang affiliations.
23            THE COURT:  Hold on a second.
24            MS. ALEGRIA:  His own words, his recorded
25   statements for this, for the AK-47 was for the -- another
```

1  gang member of East Coast Crips.

2         THE COURT:  Do you mind putting up the screen?

3         MS. ALEGRIA:  I think, Your Honor, the fact that

4  Tiny Hood was a member of his gang I don't think was in that

5  recording.  The witness did testify that's what he said.

6         THE COURT:  I get that.  Is it -- that violative

7  of some sort of term of parole or probation that he could

8  not be with Tiny Hood at the time of the incident?

9         MS. ALEGRIA:  I'm not sure.

10         THE COURT:  I guess that's part of my point.

11  You're saying, look, it's part of his association with the

12  East Coast Crips.  I don't doubt that at all.  I mean -- and

13  that's what I was saying, talking with Ms. Barrera earlier,

14  look the reality of it is Mr. Wallace is a 52-year-old gang

15  member.  His entire life, as you point out, has been about

16  this life.  Now, there's a debate about whether he's trying

17  to get out or not.  Mr. Wallace says he's trying to get out.

18  I think he is.  It's not as easy as you or I walking out of

19  this building and saying, "I don't want to hang out with

20  certain people that I don't like."  I'm not condoning it,

21  but I think that's the reality.

22         The reason I say all of that is you say that his

23  association with these gang members is something that the

24  Court should consider, but I guess my question is consider

25  as to what?  Enhancing the sentence?  Consider as to saying

1   he has three guns because he associated with a gang member?

2   What am I to consider this association?  What am I to

3   consider that in relation to?

4         MS. ALEGRIA:  A couple points.  I think in a

5   broader sense, it does go to the 3553(a) factors, but in

6   particular my argument that it goes to the sub part that

7   you're supposed to look at in determining whether something

8   is relevant conduct.

9         THE COURT:  In fairness, I have to push back.

10   Relevant conduct to what?  To him being in a gang?

11         MS. ALEGRIA:  Relevant conduct to his possession

12   of the two firearms that he has admitted to post Sentencing

13   Guidelines because in the recorded statements he did say,

14   first of all, he brandished those firearms in the marijuana

15   dispensary to others, to 62 or "Duece" as he called them.

16         THE COURT:  On the one hand, you want to use the

17   self-serving statements to say -- let me rephrase that.

18         If we're going to use this statement to try to

19   show some commonality, his statements say he had the gun,

20   the two guns at the house to deal with this marijuana

21   business.

22         This gun in the car -- there's no evidence in the

23   car to suggest that this is related to the marijuana

24   business.  I believe the Government's theory, it's in

25   support of this gang, so there's no commonality between

1    those two guns.

2           MS. ALEGRIA:  Your Honor, he also said -- and he

3    said just now that actually the real reason that he had

4    these guns was because he was afraid of --

5           THE COURT:  We're going to use the statements

6    today at the sentencing?

7           MS. ALEGRIA:  If I may play one brief clip,

8    Your Honor.

9           One second.

10          He made statements that he had these two pistols

11   because he was afraid because of the bad acts he had

12   previously committed.

13          (Audio being played.)

14          THE COURT:  All right.

15          MS. ALEGRIA:  So they were going to come and get

16   me for all I've done.

17          Your Honor, he has said in the interview, he said

18   today, he was afraid.  He's done bad things.  He was afraid

19   for his safety because of what he did gangbanging his whole

20   life.  It's part of his pattern.

21          THE COURT:  There's no doubt in my mind that Mr.

22   -- the activities that led to this crime are part and parcel

23   of Mr. Wallace's life.  The issue I have is whether or not

24   we can significantly up his sentence for what the Government

25   describes as possession of the AK-47.

1    MS. ALEGRIA:  And, Your Honor, I won't belabor the

2  point the Government has argued, and I think the case law

3  supports that this is relevant conduct.  I think there is,

4  beyond clear and convincing evidence, that he did possess

5  the firearm.

6        Your Honor, the Government is asking here for an

7  87-month sentence for several reasons.  The main reason is

8  the seriousness of this crime.

9        THE COURT:  I'm going to make a statement.  You do

10  not have to confirm.  The real reason you want the 87-month

11  sentence is because you think he's involved in the -- in

12  this RICO.

13        MS. ALEGRIA:  That's not actually true.  I didn't

14  investigate RICO.  I wasn't part of this case.  I wasn't

15  part of this investigation.  I know basically about RICO.

16        The real reason that the Government is asking for

17  the 87 -- and Your Honor knows I've been here many times

18  asking for low-end sentences -- because I think in this

19  case, this defendant, with this crime, deserves a very

20  strong, serious sentence to send a message.

21        Eighty-seven months is appropriate because

22  defendant brandished these pistols to other gang members, he

23  threatened to, quote, "Shoot their ass."

24        He left a loaded assault rifle with a

25  high-capacity magazine in a residential neighborhood.  It's

1   very dangerous.  It's a risk to the community.

2          And alongside the two guns that were in his house

3   were drugs, marijuana and, for example, Ecstasy.  And

4   apparently he has sole custody of three young children.

5          The drugs are not otherwise accounted for in

6   sentencing, neither is this more egregious, very dangerous

7   conduct.  So the seriousness of this offense really strongly

8   argues for a very high-end sentence.

9          Your Honor, defendant has had a pattern of

10  disregard for the law and disregard for human life.  He has

11  been convicted of murder.  He has been charged, but not

12  convicted with assault with a deadly weapon; and the second

13  murder was dismissed for non prosecution.

14         The Government has talked at length about his

15  pattern of being released and going back and back to

16  committing crimes.  He has had chances.  He asked for

17  another, but this is the third time that he's been convicted

18  of possessing a firearm or ammunition while being a

19  convicted felon.  A short sentence will not deter defendant

20  from committing future crimes and will not promote respect

21  for the law and will not protect this community.

22         So for all those reasons, the Government is asking

23  for 87 months.

24         THE COURT:  Thank you, Counsel.  We're all done.

25         Ms. Barrera.

44

```
1              MS. BARRERA:  Thank you, Your Honor.

2              THE COURT:  And, Ms. Barrera, you can say whatever

3    you want.  We'll stay as late as we need to.

4              This comes down to really possession.  The extent

5    you want to focus your argument, what it really comes down

6    to, did he possess this or not?

7              MS. BARRERA:  Yes, Your Honor.  I wanted to

8    mention a couple of other points, and then I'll get to the

9    possession.

10             The Government talks of self-serving statements

11   that are not supported by the evidence.  If the

12   Government -- is it referring to my client's statements

13   about his work in the community?  Those are supported by

14   evidence.  They are supported by several letters of

15   individuals who are not related to him and have no reason to

16   fabricate or intend to help him, other than they are

17   providing information to the Court that is relevant to the

18   issue of sentencing.

19             The second argument that the Government made is

20   that Mr. Wallace was stopped or investigated on different

21   occasions in the four-year period of time and he was with

22   East Coast Crips members.  And I think, Your Honor -- let's

23   be honest -- law enforcement's position is once a gang

24   member, always a gang member.

25             THE COURT:  Which is not beyond the realm of
```

1    possibility as related to Mr. Wallace.

2         MS. BARRERA:  I understand that, but my point is,

3    Your Honor, law enforcement has him down as a gang member.

4    They are going to be -- and that's just a reality.  That's

5    what they're going to do.  That's how they do their job, and

6    that's fine.  I have no disagreement with it.

7         But, you know, in terms of attributing that my

8    client was engaged in illegal activity because he is talking

9    to a gang member, that just does not hold up.

10         The third argument is that the Government

11    indicates that they received information that he was a

12    leader of the gang.  And that information apparently comes

13    from some individual; we don't know what individual.  It's a

14    confidential informant who has never testified in this case.

15    Several lawyers before me requested to get information, were

16    denied, motions were filed, they were denied.

17         And we all know -- everybody -- we all know,

18    everybody in this room, we all know what happens with

19    confidential informants.  You're looking at 30 years, you

20    don't want to go to prison for 30 years, you give me

21    something that we can work with and most of the time it has

22    been my experience that law enforcement will let informants

23    know, "Hey, we want information on so-and-so.  What can you

24    tell me?"  Informants are in a position where they give, if

25    good information, they're going to get a drastic --

1    THE COURT:  Obviously, they didn't give that good

2    information because Mr. Wallace is only charged with felon

3    in possession.

4    MS. BARRERA:  And, clearly, the Government, even

5    though they are arguing that he is a leader, they did not

6    charge him with it.  They themselves recognize that that

7    information is weak to the point that they realize that no

8    jury is going to go along with it.

9    The issue of the upward departure, Criminal

10   History V to Criminal History VI.  There are a lot of

11   studies that indicate adding another year to someone's

12   sentence does not increase the deterrence.

13   And I think in terms of deterrence, in terms of

14   recidivism, that's already been taken care of with this

15   defendant.

16   I don't want to repeat all my arguments because I

17   don't want to be here to 6:00 o'clock.

18   THE COURT:  At least you won't be.

19   MS. BARRERA:  Getting now to the possession.  The

20   Government argues that Mr. Wallace did possess the AK-47

21   rifle, that he had it in his hands.  And once Infant Hood

22   threw it into the car and once he threw it into the car.

23   They referred to one point which is a jury instruction and

24   that jury instruction says the complete opposite of what the

25   Government argues.  That instruction says a person has

1  possession if a person knows of its presence and has

2  physical control, or knows of its presence and has the power

3  and intention to control it.  Mr. Wallace did not have

4  physical control.

5          If you -- if this Court wants to believe the

6  agent, that Mr. Wallace said he handled that, this Court can

7  give credit to that, even though my client says he didn't

8  say that.  And there is no proof that he actually said that.

9  There is no recording where he says, "Oh, yeah.  I handled

10 the rifle."

11         But even if we were to believe that, a temporary

12 handling does not give the individual possession because he

13 does not have physical control of it.  That's the key.  Or

14 the power or intention to control it.  That was with

15 Infant Hood only.  That was not with Mr. Wallace.  He was

16 not in possession of it.

17         But even if he was in possession of it, it is not

18 relevant because the facts do not meet the test.  And I

19 don't agree with the Government's argument in terms of what

20 regularity, similarity and temporal proximity mean.

21 Regularity has to do with how many times does that happen,

22 and there is abundant case law that says if you only have

23 two instances like in this case, there is an absence of

24 regularity.  By admission you're going to have one to start

25 with, and if you only have one additional one that amounts

1   to absence of regularity.

2           And there is abundant case law -- the case that

3   comes to mind of immediately is United States versus

4   Ahmanson (ph), and it specifically says that there is an

5   absence of regularity.  When there is absence of

6   regularity -- and on this case, there is no strong evidence

7   on the other two factors.

8           Similarity -- and before I get to that, the test

9   also says that offenses are part of the same course of

10  conduct if they are sufficiently connected or related to

11  each other to warrant the conclusion that they are part of a

12  single episode, a single spree or ongoing series of

13  offenses.

14          So just right there, without even getting into

15  regularity, similarity, temporal proximity, the Government's

16  argument fails because my client indicated that the two

17  firearms that he had in his home, he used them -- he did use

18  them when he went to the marijuana dispensary.

19          He did also indicate, as he stated today, that he

20  was sometimes afraid that someone would shoot him when he

21  went into this back alley, but that is not in any way

22  connected with the rifle.  They have to be sufficiently

23  connected so that they are part of a single episode, a spree

24  or ongoing series.

25          And that -- so without even getting into the three

1  factors, the Government's argument fails.

2        But if we go into those factors -- now, I've

3  addressed regularity.

4        Similarity, the Government says:  Look, he's a

5  felon in possession of two guns, and he did possess the

6  rifle, so he's a felon in possession there.  There we go.

7  We have this strong similarity.  And that's not what the

8  case law says.

9        The case law says that there has to be this common

10 scheme.  There is no common scheme here.

11       In Everson (ph), the Court stated some additional

12 evidence of similarity, nothing more than the fact that both

13 offenses involved illegal firearm possession is necessary to

14 overcome a total lack of another course of conduct factor.

15       So the fact that the Government can argue, well,

16 if he possessed both of them, he was a felon in possession

17 on both of them.  The case law specifically says that's not

18 enough.  You have to show common victims, similar modus

19 operandi, and none of this is in this case.

20       And that's where the temporal proximity comes into

21 play because this is seven months before he possessed the

22 two firearms.  There is no connection in terms of

23 accomplices.  The two firearms he has said was for the

24 purposes of his protection and to protect the marijuana

25 dispensary.  There is no reason to believe that he was going

```
 1   to use the AK 47 in any way.  It's an assault rifle.  Why
 2   would anybody even have that than to engage in some kind of
 3   assaultive behavior.
 4          He admitted that, and he told the agents that, but
 5   he said it was really to scare them.  It wasn't like he was
 6   really going to shoot them.  So there is no commonality
 7   between the two.  So the similarity is absent in this case.
 8          The temporal proximity in the case in Emerson, it
 9   was three-and-a-half months, and they said that is not
10   strong enough timing evidence to overcome a complete lack of
11   regularity.  In this case, it was seven months, so it is
12   certainly not enough to overcome a complete lack of
13   regularity.
14          So the case law states that there has to be this
15   stronger presence, and it just didn't happen in this case.
16   I think the Government is relying on some out-of-circuit
17   cases that are just not applicable in this case.  And if we
18   look at the cases that I did cite -- the more recent cases
19   which were Varcam, Emerson, those are more recent cases --
20   they suggest that not only was there no possession here, but
21   that it is certainly not relevant conduct.
22          Unless the Court has some questions, I would
23   submit it at this point.
24          THE COURT:  I don't have any questions.
25          Do you feel the need to respond?
```

1          MS. ALEGRIA:  Just on the case law the Government

2  is citing is relying on Ninth Circuit case law primarily

3  which says when you had conduct with the guns was not only

4  similar but identical to the conduct for which defendant was

5  convicted.  Each act was possession of firearms by a

6  convicted felon.

7          So in the Ninth Circuit when you have felon in

8  possession and then other uncharged firearms which would be

9  felon in possession, that's the similarity.  And in the

10 Ninth Circuit, it's identical.  So it's very strong in terms

11 of the similarity factor.

12         And, Your Honor, the Seventh Circuit said within

13 six to nine temporal was okay.

14         The Fifth Circuit found that uncharged firearms

15 possessed within eight months --

16         THE COURT:  Look, it's clear based on the cases of

17 both sides, you can make an argument whether it's enough

18 time.  This case is whether it's possession, and whether

19 it's enough of common scheme, at least with the Court's

20 perspective.  So whether that happened two months ago, nine

21 months ago, that's argument --

22         MS. ALEGRIA:  So with that, I submit.

23         THE COURT:  All right.  I appreciate the arguments

24 on both sides.

25         Mr. Wallace, I got a lot that I want to say to

1  you, I really do, but it's been a long afternoon.

2        And as I said earlier to the Government, you're

3  doing exactly what I would expect the Government to do.  I'm

4  not criticizing the Government at all.  Mr. Wallace -- it's

5  not his first time at the rodeo, but having said that, I

6  just don't think there's enough evidence, number one, that

7  Mr. Wallace -- as it relates to this prior incident -- had

8  the power and intention to control the weapon consistent

9  with the cases that have been discussed already.

10        And I'm not even sure if there was evidence that

11  it was possession.  And I have real concern about it.  I'm

12  not sure whether it fits within the common scheme or plan as

13  articulated within one.  I share the same view of the

14  probation view of -- as the probation office in that regard.

15        So I'm not going to consider the third, I should

16  say, the third weapon, which happens to be AK-47 as

17  relevant.

18        So based on that, I do find the report to be

19  accurate and correct.  I adopt the report and the

20  calculations of the guidelines.

21        Now, Mr. Wallace, I'm going to speak to you in

22  times a less formal way because I'm hoping we can have a

23  real conversation.

24        We are the same age, okay, and I don't profess to

25  know the life that you've led.  I've read about it.  And one

1  hand, I want to tell you, "You're too old for this, man."

2  Straight out.  You still have some life in you.  You got a

3  mom that's worked her butt off -- and pardon my language --

4  raised kids and things didn't work out with you because of

5  the decisions that you made.  She's not at fault.  Nobody

6  else is.  That's on you.

7       And the part that I'm really on the fence about,

8  you're telling me that you're trying to do the right -- but

9  for someone who's trying to do the right thing, you seem to

10  get in the mix with the cops a lot.

11       I worked with LAPD for almost ten years.  I think

12  Ms. Barrera mentioned this earlier, but again I'm speaking

13  to you man to man.  Okay.  If you don't think when you get

14  out of prison Shootin' Newton, then you're smoking the weed

15  that you're supposed to be guarding at this dispensary.  And

16  I'm just being real with you.  That means you can't do

17  anything wrong.

18       You come back to me on a violation, that's it.

19  And I'm just -- so there's no disagreement or understanding

20  with -- no upset.  You come back to me on violation, you'll

21  wish you got 87 months to start, because I'm just being

22  honest with you.

23       Look, man to man, you put us through the ringer in

24  this case.  But you had every right to do so.  We gave you

25  not one, but two lawyers.  And if you don't think you've

1  gotten the best that you could, you're smoking the weed in

2  that dispensary.  They came with it today.  We just have a

3  difference of opinion, and I'm not knocking the Government.

4  And I hope the family will respect everyone has a job.

5  Ultimately I get paid an extra $50 to make that decision.

6          So, again, I just want to be crystal clear.  I got

7  some concerns.  I think you want to do the right thing, I

8  really do.  I'm just worried that these streets are --

9  that's a tough thing to pull away from.  Again, I

10  acknowledge that, and I'm just worried.

11          You get out there at the beginning, you stay with

12  your family.  Everything cool.  Four months, five months,

13  six months.  You got brothers, family members who are

14  helping you along.  At some point, the rubber is going to

15  hit the road.  When you go apply for a job:  Have you ever

16  been convicted of a felony?  Check.  That's a problem.  And

17  then you start looking how am I going to make money.  Come

18  and work with me at the dispensary.  And what does that

19  entail?  You can't be a security guard without something,

20  and then we start down this road.

21          But the problem is you don't have that luxury,

22  sir.  You just don't.  And I will probably say this more

23  than once before we wrap up, if you don't think law

24  enforcement is going to be watching your every move, you are

25  a fool.  And the next time you come back, it's game over.

1 The guidelines are such, you pick up another felon in

2 possession of a firearm -- talk to Ms. Barrera, she'll tell

3 you -- you tell your family smash up your plates and your

4 silverware because you're not coming home.

5          So I'm being real with you.  So it's up to you how

6 you want to do it.  I'm telling you, it's going to be a hard

7 road.

8          Do I think you have a grit and the fortitude?  You

9 have it in you, you channel it in the right way.

10          So with that, I'm going to impose sentence in this

11 case because I got question marks about it.  Because I think

12 I want to do the right thing, but again I'm looking at this

13 record, just time and time again, you're in the mix, and you

14 got to make a decision now.

15          You tell me you're going to move to Compton.  I

16 hope you do.  You need to run away if you see any of your

17 old buddies from the hood.  I mean, you need to literally

18 walk away because the consequence is just -- at least from

19 my perspective, the consequence is just too steep.  It may

20 not be for you.  We'll bring you back here, we'll do the

21 three hots and a cot again, and that's the end of it.

22          You know Captain Tangeray (ph).  I knew him too.

23 I knew him since he was a lieutenant.

24          And I'm keeping this file in my chambers because I

25 want to see what happens.

1    So with that, I'm consulting and taking the most

2  recent edition of the sentencing guidelines.  The total

3  offense level based on the probation officer's calculation

4  is 12, the Criminal History Category is V, the guideline

5  range for custody is 27 to 33 months, the guideline range --

6  there's no probation in here.

7    But the guideline range for supervised release is

8  one to three years, the guideline range for the fine is

9  $5,500 to $55,000, and the special assessment in this case,

10 I believe, is -- I think it's $100.  Let me just --

11    MS. ALEGRIA:  That is correct, Your Honor.

12    THE COURT:  Thank you.

13    So in pronouncing the sentence that I'm going to

14 pronounce, I'm making an individualized determination based

15 on the facts of this case, individualized circumstances of

16 Mr. Wallace, the need for the sentence to reflect the

17 seriousness of the crime, afford adequate deterrence for the

18 criminal conduct and to protect the public from further

19 crimes of this defendant.  I've considered other kinds of

20 sentences that are available, and I've considered the

21 sentencing guidelines.

22    Is there any reason why the sentence should not

23 now be imposed, Ms. Alegria?

24    MS. ALEGRIA:  No, Your Honor.

25    MS. BARRERA:  No, Your Honor.

```
 1              THE COURT:  And I find that the following sentence

 2   is reasonable and sufficient but not greater than necessary

 3   to comply with the statements stated in 18 U.S.C. Section

 4   3553(a).

 5              It's ordered that Mr. Wallace pay to the

 6   United States a special assessment of $100.  That is due

 7   immediately.

 8              Any unpaid balance shall be due during the period

 9   of imprisonment at a rate of not less than $5 dollars per

10   quarter and pursuant to the Bureau of Prisons' Inmate

11   Financial Responsibility Program.

12              Pursuant to 5E1.2a of the guidelines, all fines

13   are waived as the Court finds that Mr. Wallace has

14   established he's not able to pay.

15              It is my assessment that pursuant to the

16   Sentencing Reform Act, it is the judgment of this Court that

17   Mr. Paul Gary Wallace is committed on Count One of the

18   single-count indictment to the custody of the Bureau of

19   Prisons for a term of 30 months.

20              Upon release from imprisonment, Mr. Wallace will

21   be placed on supervised release for a term of three years.

22              You shall comply with the rules and regulations of

23   the United States Probation Office and General Order 05-02.

24              Mr. Wallace has got to listen to this stuff

25   carefully.  You shall refrain from any unlawful use of a
```

1    controlled substance.  Okay.

2            Do you understand that, sir?

3            THE DEFENDANT:  Yes, sir.

4            THE COURT:  And, again, I'm just speaking to you

5    in colloquial term.  No weed, no molly, none of that.

6            THE DEFENDANT:  Yes, sir.

7            THE COURT:  You submit to one drug test within

8    15 days of release from custody and at least two periodic

9    drug tests thereafter, not to exceed eight tests per month

10   as directed by the probation officer.

11           You shall participate in out-patient substance

12   abuse treatment and counseling program that includes

13   urinalysis, breath and/or sweat patch testing as directed by

14   the probation officer.

15           You shall abstain from using alcohol or illicit

16   drugs or from abusing prescription medications during the

17   period of supervision.

18           If a doctor says you need medication, you got a

19   legitimate doctor note, then you can take your medication.

20           You shall pay for all or part of the treatment

21   programs as directed by the probation officer.  If you don't

22   have the ability to pay for those programs, no payment shall

23   be required.

24           During your period of supervised release, you

25   shall pay the assessment in accordance with this Court's

1  order and the judgment in this case.

2       When you're not working or if you don't have an

3  excuse by your probation officer for schooling or training

4  or anything like that, you have to perform 20 hours of

5  community service per week.

6       My strong question to you is you need to try to

7  get a job at one of these youth groups where you can help

8  these kids and that will suffice.

9       Now, there's this point.  I will probably repeat

10 it.  You shall not associate with anyone that's known to you

11 to be a member of 69 East Coast Crips gang and others known

12 to you to be participants of the gang's criminal activity

13 except for family members.  Okay.  That's what I was saying

14 earlier.  You see someone from the neighborhood, "Hey, man.

15 I can't talk to you.  I'm out."  You understand?

16      THE DEFENDANT:  Yes, sir.

17      THE COURT:  You have a family member that's a

18 member of the gang, that's fine, but not play cousins.  I'm

19 talking real family members.

20      Do you understand?

21      THE DEFENDANT:  Yes, sir.  How about the only one

22 I have, no reason to be around him.

23      THE COURT:  You may not wear, display, use or

24 possess any gang insignias, meaning like symbols, any

25 emblems, any badges, buttons, caps, hats, jackets, shoes or

1   clothing that you know is evidence of affiliation with the

2   69 East Coast Crips gang.  And you may not display any signs

3   or gestures that you know show your connection or

4   affiliation with the 69 East Coast Crips gang.

5           Do you understand that, sir?

6           THE DEFENDANT:  Yes, sir.

7           THE COURT:  Do you have any questions about that

8   term, sir?

9           THE DEFENDANT:  No, sir.  I know exactly what

10  you're talking about.

11          THE COURT:  All right.  Another important piece.

12  You, as directed by your probation officer, you shall not be

13  present in any area known to you to be a location where

14  members of the 69 East Coast Crips gang meet or assemble.

15          Do you understand that?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  So if you want to take your kids to

18  the park and you know that's a 69 East Coast Crips park,

19  guess what, you're not going to that park.

20          Do you understand that?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  And I want to make sure that the

23  family understands that as well.

24          You shall cooperate in the collection of a DNA

25  sample, and that is all.

1    I find that this sentence is reasonable and

2  sufficient given the facts of this case.

3    Sir, you have the right to appeal your sentence

4  and also I think we have the suppression motion, you can

5  appeal that as well if you so desire.

6    You must file your appeal win 14 days of the

7  judgment being entered in this case.  So the judgment is the

8  paperwork that I will sign that shows what the sentence is.

9  So you must do so within 14 days.

10    Now, if you are unable to afford a transcript of

11  the record of this case, one will be provided for you at the

12  Government's expense.

13    If you can't pay for the cost of appeal, you can

14  file an application saying I can't pay for it.  You won't

15  have to pay the fee for filing an appeal.

16    If you don't have a lawyer to represent you in an

17  appeal, you have to file a request with the court within

18  14 days asking that a lawyer be appointed for you to

19  represent you in this appeal.

20    You're remanded back to the Bureau of Prisons.  Is

21  there anything further we need to discuss at this time?

22    MS. ALEGRIA:  Not from the Government.

23    THE COURT:  All right.  I'm going to authorize

24  that the presentence report be disclosed to any treatment

25  providers that you're ordered to participate, so they have

1  an understanding of your background or life experience but

2  further redisclosure of the presentence report is prohibited

3  without the consent of this Court.

4      All right.  Nothing further.  Ms. Alegria?

5      MS. ALEGRIA:  No, Your Honor.

6      THE COURT:  You did a great job on behalf of the

7  Government.  We just have a difference of opinion.

8      Ms. Barrera?

9      MS. BARRERA:  Nothing with the defendant.

10      THE COURT:  Mr. Wallace, please, please prove me

11  wrong.  Prove to me that this is it.

12      THE DEFENDANT:  Yes, sir.  I will.  I'll show you

13  guys.  We appreciate it.  And thank you, sir.

14      (*Thereupon, proceedings adjourned*)

15

16      -oOo-

17

18

19

20

21

22

23

24

25

```
 1
 2
 3
 4                        CERTIFICATE
 5
 6         I hereby certify that pursuant to Section 753,
 7   Title 28, United States Code, the foregoing is a true and
 8   correct transcript of the stenographically reported
 9   proceedings held in the above-entitled matter and that the
10   transcript format is in conformance with the regulations of
11   the Judicial Conference of the United States.
12
13   Date:  August 5, 2020
14
15                                    Lisa M. Gonzalez
                    /s/_____
16                   Lisa M. Gonzalez, U.S. Court Reporter
                     CSR No. 5920
17
18
19
20
21
22
23
24
25
```

# EXHIBIT C

**EAST WEST MEDICAL GROUP**
3680 E. Imperial Hwy. #300
Lynwood, CA 90262
(310) 631-8663

January 9, 2006

Department of Social Services
Disability Evaluation Division
P.O. Box 60999
Los Angeles, CA 90030

RE: Paul Wallace

ATTN: Truong

The following is a summary   report of NEUROLOGICAL EVALUATION
performed at this medical facility at the request of your
department.

**SOURCE & RELIABILITY:** Mr. Wallace is a 39-year-old, right-handed
male. History is obtained from Mr. Wallace.



RE:   Paul Wallace

Page: 2

**DAILY ACTIVITIES**:  Mr. Wallace shares a home with his mother.  He visits local high schools and recreation centers to speak to teenagers about not joining gangs.